1

1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF OHIO

3           WESTERN DIVISION

4                * * *

5  IGOR ELMAN,              CASE NO. 3:18-cv-0358

6       Plaintiff,          JUDGE WALTER H. RICE

7        vs.                MAGISTRATE PETER SILVAIN

8  WRIGHT STATE UNIVERSITY,

9       Defendant.

10               * * *

11       Deposition of **JULIE PATRICE GENTILE, M.D.,**

12  Witness herein, called by the Plaintiff for

13  cross-examination pursuant to the Rules of Civil

14  Procedure, taken before me, Angela R. Dilts, Court

15  Reporter and Notary Public in and for the State of

16  Ohio, at the offices of Craig T. Matthews &

17  Associates, 320 Regency Ridge Drive, Centerville,

18  Ohio, on Thursday, December 5, 2024 at 10:25 a.m.

19               * * *

20

21

22

23

24

25

2

1   APPEARANCES:

2      ON BEHALF OF THE PLAINTIFF:

3      By:   Craig T. Matthews, Esq.
             Craig T. Matthews & Associates, LPA
4            320 Regency Ridge Drive
             Centerville, Ohio 45459
5            937-434-9393
             cmatthews@ctmlaw.com
6
       ON BEHALF OF THE DEFENDANT:
7
       By:   Rory Callahan, Esq.
8            Ashley Barbone, Esq.
             Wendy Clary, Esq. (via telephone)
9            Ohio Attorney General's Office
             30 East Broad Street
10           Columbus, Ohio 43215
             614-644-7257
11           rory.callahan@ohioago.gov

12  ALSO PRESENT:

13           Igor Eleman

14                          *   *   *

15

16

17

18

19

20

21

22

23

24

25

3

1              <u>EXAMINATION CONDUCTED</u>        <u>PAGE</u>

2    BY MR. MATTHEWS:                          4

3

4            <u>PLAINTIFF'S EXHIBITS MARKED</u>     <u>PAGE</u>

5    Exhibit G:  Subpoena                     8

6    Exhibit A:  11-15-16 letter to           9

7                Dr. Dunn

8    Exhibit 32:  Email string                11

9    Exhibit D:  11-15-16 letter to           13

10                Dr. Dunn

11   Exhibit I:  Curriculum vitae             41

12   Exhibit 31:  12-5-16 letter from         48

13                Dr. Dunn

14   Exhibit F:  Declaration of Julie P.      58

15                Gentile, M.D.

16

17

18

19

20

21

22

23

24

25

4

1          JULIE PATRICE GENTILE, M.D.

2    of lawful age, Witness herein, having been first

3    duly cautioned and sworn, as hereinafter

4    certified, was examined and said as follows:

5                    CROSS-EXAMINATION

10:25:22  6    BY MR. MATTHEWS:

10:25:22  7          Q.    Let's begin.  We briefly met

10:25:27  8    downstairs minutes ago.  I'm Craig Matthews.

10:25:31  9    I'm the attorney for the plaintiff in the

10:25:36  10   captioned litigation Dr. Igor Elman.  You're

10:25:41  11   here today for a deposition.  I'm going to ask

10:25:46  12   you to begin by stating your full name and

10:25:50  13   address.

10:25:51  14         A.    Julie Patrice Gentile and I live

10:25:55  15   at --

10:25:56  16         MR. CALLAHAN:  I'd note Dr. Gentile

10:25:58  17   is a department chair for the university.  She's

10:26:01  18   here by agreement.  If you need to subpoena her or

10:26:04  19   something, you can send it to me.  I think you've

10:26:08  20   already sent her something previously but we don't

10:26:10  21   need to include that in the record.

10:26:12  22         MR. MATTHEWS:  Okay.  I'm not sure

10:26:16  23   I'm understanding what you're saying, Rory.  Did I

10:26:20  24   miss something?

10:26:20  25         MR. CALLAHAN:  We don't need to put

10:26:21  1   her personal address in the record.

10:26:23  2                    MR. MATTHEWS:  Oh, I see.  If you

10:26:24  3   would rather not, that's fine.

10:26:25  4                    MR. CALLAHAN:  She's the department

10:26:27  5   chair of the university.  You can contact me if

10:26:29  6   you want to issue a subpoena.

10:26:30  7   BY MR. MATTHEWS:

10:26:31  8        Q.   Dr. Gentile, that's correct,

10:26:33  9   you're the department chair at Wright State

10:26:39 10   University?

10:26:39 11        A.   I am.

10:26:39 12        Q.   Have you ever been deposed before?

10:26:42 13        A.   I've been in legal proceedings

10:26:44 14   such as mediations but not a deposition

10:26:49 15   specifically.

10:26:53 16        Q.   Okay.  So you've never had your

10:26:57 17   deposition taken nor viewed or watched a

10:27:02 18   deposition?

10:27:03 19        A.   No, I have not.

10:27:04 20        Q.   Okay.  All right.  Well, let me

10:27:06 21   talk to you a bit about just the groundworks,

10:27:10 22   so to speak.

10:27:11 23                    So I'll be asking you a number of

10:27:14 24   questions this morning.  You're under oath.

10:27:16 25   You understand that, correct?

6

10:27:18  1          A.   Yes.

10:27:18  2          Q.   All right.  And we have a court

10:27:22  3     reporter present obviously.  With the court

10:27:24  4     reporter present, it's important that all of

10:27:26  5     your responses to my questions be verbal.  In

10:27:32  6     other words, if you nod your head to indicate

10:27:34  7     yes or shake your head to indicate no, everyone

10:27:36  8     in the room will understand what you're saying

10:27:39  9     but the court reporter can't take that down.

10:27:42 10     So your responses need to be verbal.

10:27:45 11          Since I'm going to be asking

10:27:48 12     questions and you're going to be answering them

10:27:50 13     and we have a court reporter present, it's

10:27:53 14     important that you wait until I finish my

10:27:55 15     question before providing your answer.  Even

10:28:00 16     though you might anticipate where I'm going, it

10:28:05 17     makes it difficult for the court reporter to

10:28:07 18     transcribe two of us talking at the same time.

10:28:11 19     It also provides your counsel, or the attorney

10:28:15 20     general, with an opportunity to object.  Do you

10:28:21 21     have any questions?

10:28:22 22          A.   No, I don't.

10:28:23 23          Q.   Okay.  And if you need to take a

10:28:25 24     break -- I don't think we're going to be doing

10:28:27 25     this very long, but if you need to take a

7

10:28:29 1 break, just let me know. I just ask that the

10:28:35 2 break occur after you have answered a question

10:28:37 3 and not after a question -- provide the answer

10:28:44 4 and then we can take a break after you've

10:28:46 5 answered. Do you understand?

10:28:47 6          A.    I understand.

10:28:48 7          Q.    Very good. So you are appearing

10:28:55 8 this morning by agreement of counsel and

10:29:02 9 pursuant to a subpoena which was served upon

10:29:05 10 you; is that correct?

10:29:06 11          A.    That's right.

10:29:07 12          MR. CALLAHAN: Objection. She's

10:29:08 13 appearing by agreement on a date that was agreed

10:29:10 14 upon previously.

10:29:11 15 BY MR. MATTHEWS:

10:29:11 16          Q.    Okay. Well, I think you answered

10:29:14 17 the question yes. Did I hear you say yes?

10:29:20 18          A.    What was the question?

10:29:21 19          Q.    That you are appearing today by

10:29:23 20 agreement of counsel and also pursuant to a

10:29:26 21 subpoena?

10:29:26 22          MR. CALLAHAN: Note an objection.

10:29:27 23 You can answer.

10:29:30 24          THE WITNESS: I'm here by agreement

10:29:33 25 of this date for this meeting.

10:29:33    1            (Thereupon, Plaintiff's Exhibit G:

10:29:33    2    Subpoena, was marked for purposes of

10:29:34    3    identification.)

10:29:34    4    BY MR. MATTHEWS:

10:29:34    5            Q.    I'm handing you what I've labeled

10:29:37    6    as Exhibit G.  Do you recognize that document?

10:29:46    7            A.    I do.

10:29:47    8            Q.    And this is a copy of a subpoena

10:29:50    9    to testify at a deposition in a civil action

10:29:54   10    which was served upon you, correct?

10:29:57   11            MR. CALLAHAN:  I'll note an objection

10:29:59   12    to the subpoena.  This has been the subject of

10:30:01   13    communications between counsel regarding the

10:30:03   14    production of documents.  And my understanding is

10:30:06   15    that the production of documents issue was

10:30:08   16    resolved prior to the deposition occurring today.

10:30:13   17            MR. MATTHEWS:  Objection noted.  You

10:30:14   18    may answer the question.

10:30:16   19            THE WITNESS:  Yes.

10:30:17   20    BY MR. MATTHEWS:

10:30:17   21            Q.    All right.  And it is my

10:30:22   22    understanding that the only responsive document

10:30:29   23    is a memo that you provided to Dr. Dunn dated

10:30:41   24    November 15, 2016; is that correct?

10:30:44   25            MR. CALLAHAN:  Note an objection to

9

```
10:30:47   1    the question.  You can answer.
10:30:49   2                  THE WITNESS:  Yes.
10:30:50   3    BY MR. MATTHEWS:
10:30:51   4         Q.   All right.  I'm handing you what
10:30:53   5    I've labeled Exhibit A.
10:30:53   6                  (Thereupon, Plaintiff's Exhibit A:
10:30:53   7    11-15-16 letter to Dr. Dunn, was marked for
10:30:59   8    purposes of identification.)
10:30:59   9    BY MR. MATTHEWS:
10:30:59  10         Q.   Take whatever time you need to
10:31:01  11    review that document.  And my question is:  Do
10:31:12  12    you recognize that document?
10:31:14  13         A.   I do.
10:31:15  14         Q.   And is this the only document in
10:31:22  15    your possession relating to the subpoena?
10:31:28  16                  MR. CALLAHAN:  Noting an objection, a
10:31:30  17    continuing objection to questions to the witness
10:31:33  18    about the document marked Plaintiff's Exhibit A
10:31:35  19    for this deposition.
10:31:40  20                  MR. MATTHEWS:  What is the continuing
10:31:41  21    objection?
10:31:42  22                  MR. CALLAHAN:  I'm not going to make
10:31:45  23    speaking objections.  Do you want to have a
10:31:47  24    colloquy on the record about it?
10:31:48  25                  This was the subject of emails
```

10

| | |
|---|---|
| 10:31:50 | 1 before. You issued a subpoena asking for all |
| 10:31:53 | 2 documents related to Dr. Igor Elman and it's |
| 10:31:57 | 3 overbroad. There's no -- it's not limited to the |
| 10:31:58 | 4 lawsuit. It's not limited to any specific issues |
| 10:32:00 | 5 in the lawsuit. You narrowed that request in an |
| 10:32:04 | 6 email yesterday. And, again, I identified that |
| 10:32:09 | 7 Dr. Gentile was not a decision maker in this case |
| 10:32:14 | 8 but that this was a memo that she had created and, |
| 10:32:18 | 9 as it says, sent to then Dean Dunn. |
| 10:32:22 | 10 MR. MATTHEWS: And we had an email |
| 10:32:25 | 11 discussion regarding this. You indicated that as |
| 10:32:28 | 12 to Dr. Gentile, this was the only responsive |
| 10:32:31 | 13 document. Am I correct or is there a |
| 10:32:33 | 14 misunderstanding there? |
| 10:32:34 | 15 MR. CALLAHAN: Well, again, I think |
| 10:32:36 | 16 what the issue is, it has been kind of changed at |
| 10:32:39 | 17 different times by Mr. Matthews, so we provided |
| 10:32:42 | 18 these -- this document and other documents for |
| 10:32:47 | 19 documents related to the removal of Dr. Elman as |
| 10:32:51 | 20 department chair. But, again, to the extent that |
| 10:32:54 | 21 there are other issues, there may be other |
| 10:32:56 | 22 documents that we rely on at different times |
| 10:33:00 | 23 depending on the issue. |
| 10:33:03 | 24 MR. MATTHEWS: Well, that's different |
| 10:33:04 | 25 than the understanding that I thought we had |

11

10:33:07 1 reached last night, and I'm going to -- I'm going

10:33:11 2 to have to mark as an exhibit our correspondence.

10:33:16 3 Do you have an exhibit label there?

10:33:16 4             COURT REPORTER:  I do.

10:33:30 5             MR. MATTHEWS:  Let's mark this

10:33:30 6 exhibit as 32.

10:33:30 7             (Thereupon, Plaintiff's Exhibit 32:

10:33:30 8 Email string, was marked for purposes of

10:33:38 9 identification.)

10:33:38 10             MR. MATTHEWS:  I am handing you,

10:33:40 11 Rory, what I marked as Exhibit 32 which is a

10:33:44 12 printout of our email correspondence which

10:33:48 13 concluded last night --

10:33:50 14             MR. CALLAHAN:  Well --

10:33:50 15             MR. MATTHEWS:  -- for the record.

10:33:51 16 It's my understanding that we're proceeding this

10:33:54 17 morning based upon that representation.  And I

10:33:57 18 just want to make sure you're not changing or

10:34:00 19 retracting what you said last night; is that

10:34:01 20 correct?

10:34:01 21             MR. CALLAHAN:  Whatever is in the

10:34:02 22 email is what I said obviously.

10:34:04 23             MR. MATTHEWS:  Okay.

10:34:04 24             MR. CALLAHAN:  I think, first, this

10:34:06 25 exhibit is not a proper exhibit for this witness.

12

10:34:09 1   It's not -- this was emails between counsel.  It's
10:34:12 2   not something that she can authenticate or has
10:34:14 3   personal knowledge of.  You're raising a legal
10:34:17 4   dispute instead of asking this witness factual
10:34:20 5   questions about her personal knowledge or what her
10:34:21 6   awareness is of the procedures at the university.
10:34:25 7   So I think there are some other issues here.
10:34:27 8   There's a Dr. Molly Hall referenced in these nine
10:34:31 9   pages of emails.  There's different issues.
10:34:33 10              This was something that was provided
10:34:34 11  to you so that we didn't have to litigate the
10:34:37 12  scope of the document request that you sent last
10:34:41 13  week directly to the witness.  So I think it's not
10:34:45 14  a proper exhibit.
10:34:46 15              You know, I'll let you continue the
10:34:47 16  deposition but I'm objecting to this and I reserve
10:34:50 17  the right to either move to have it redacted or
10:34:53 18  removed from the deposition at a later date.
10:34:55 19              MR. MATTHEWS:  Objection noted.  But
10:34:57 20  my question is:  You are not retracting any
10:35:01 21  representation you made in what has been labeled
10:35:05 22  Exhibit 32; is that correct?
10:35:06 23              MR. CALLAHAN:  That's an email
10:35:08 24  exchange that we had I think Tuesday and
10:35:12 25  yesterday, December 3rd and 4th.  So, yes, I think

13

```
10:35:15   1   it is an accurate document.  It is what it appears
10:35:19   2   to be.
10:35:19   3            MR. MATTHEWS:  Thank you.  That's all
10:35:21   4   I needed on that.  I wanted the record to be very
10:35:23   5   clear.
10:35:27   6            (Thereupon, Plaintiff's Exhibit D:
10:35:27   7   11-15-16 letter to Dr. Dunn, was marked for
10:35:27   8   purposes of identification.)
10:35:27   9   BY MR. MATTHEWS:
10:35:27  10            Q.   Handing you what I've labeled as
10:35:29  11   Exhibit D, do you recognize Exhibit D?
10:36:56  12            A.   Yes.
10:36:57  13            Q.   What is Exhibit D?
10:37:03  14            A.   It's a document that I handed to
10:37:07  15   Dean Dunn several years ago.
10:37:11  16            Q.   All right.  And is it identical in
10:37:16  17   content to Exhibit A?
10:40:13  18            A.   I don't know.  Do you want to give
10:40:16  19   me more time to look through it?
10:40:16  20            Q.   Take whatever time you need.
10:51:43  21            A.   Okay.  I believe they are the
10:51:44  22   same.
10:51:45  23            Q.   All right.  Did you author both of
10:51:47  24   these documents?
10:51:48  25            MR. CALLAHAN:  Objection.  You can
```

14

10:51:49 1    answer.

10:52:16 2                    MR. MATTHEWS:  Can you make a note of

10:52:18 3    the time?

10:52:18 4                    COURT REPORTER:  There will be

10:52:18 5    timestamps.

10:52:18 6                    MR. CALLAHAN:  Objection.  You can

10:52:20 7    answer.  Go ahead.  You said she can take time to

10:52:33 8    review the seven-page document.

10:52:34 9                    MR. MATTHEWS:  I was just asking the

10:52:37 10   court reporter to make note of the time.

10:52:39 11   BY MR. MATTHEWS:

10:52:39 12        Q.    You may answer the question.

10:52:45 13        A.    I believe I authored the document.

10:52:49 14        Q.    Both Exhibits A and D were

10:52:55 15   authored by you?

10:53:53 16        A.    I believe so.

10:53:56 17        Q.    Do you note that there are

10:54:00 18   differences between these two documents in

10:54:01 19   terms of pagination?

10:54:04 20                    MR. CALLAHAN:  Objection.  You can

10:54:05 21   answer.

10:54:07 22                    THE WITNESS:  I didn't note

10:54:09 23   differences in these two documents.

10:54:10 24   BY MR. MATTHEWS:

10:54:11 25        Q.    Well, take a look at Exhibit A.

15

10:54:15  1   Can you read just the last line of Exhibit A,

10:54:25  2   first page, last line?

10:54:30  3                    MR. CALLAHAN:  Objection.  You can

10:54:31  4   answer.

10:54:41  5                    THE WITNESS:  The last full -- the

10:54:43  6   full sentence?

10:54:43  7   BY MR. MATTHEWS:

10:54:44  8        Q.    Yes, just the last line.

10:54:47  9        A.    The last full sentence?

10:54:49 10        Q.    No, the last line.

10:54:55 11        A.    About each faculty was extremely

10:54:58 12   time consuming.  For 2017 he plans to revise

10:55:02 13   systems so that --

10:55:03 14        Q.    Thank you.  Could you turn to

10:55:05 15   Exhibit D and read the last line of the first

10:55:10 16   page of Exhibit D?

10:55:15 17        A.    Names or military status nor did

10:55:18 18   he appear able to identify the chief residents.

10:55:21 19   I specifically --

10:55:23 20        Q.    Do you agree that those are

10:55:25 21   different sentences?

10:55:27 22                    MR. CALLAHAN:  Objection.  You can

10:55:28 23   answer.

10:55:33 24                    THE WITNESS:  Well, the fonts are

10:55:35 25   different on these two documents and the

16

10:55:37 1  formatting is different on the two documents.

10:55:39 2  BY MR. MATTHEWS:

10:55:39 3       Q.    Thank you.  Can you explain why

10:55:42 4  that is?

10:55:53 5       A.    Can I explain why the fonts are

10:55:55 6  different?

10:55:56 7       Q.    Correct.

10:55:58 8       A.    No.

10:56:02 9       Q.    Which of these two documents did

10:56:08 10 you testify that you handed to Dean Dunn?

10:56:22 11      A.    I don't recall handing a document

10:56:25 12 to her with this font.

10:56:29 13      Q.    And when you say you're saying

10:56:31 14 this font, are you referring to Exhibit A?

10:56:33 15      A.    I am.

10:56:33 16      Q.    Okay.  So is it fair to say that

10:56:37 17 your testimony this morning is that the

10:56:40 18 document that you handed to Dean Dunn was

10:56:44 19 Exhibit D?

10:56:57 20      A.    I imagine it was.

10:56:59 21      Q.    Well, I'm not asking you to

10:57:00 22 imagine anything.  I'm asking, did you hand

10:57:04 23 Exhibit D to Dean Dunn?

10:57:07 24           MR. CALLAHAN:  Objection.  You can

10:57:08 25 answer.

17

10:57:08  1          THE WITNESS:  I don't know.

10:57:09  2   BY MR. MATTHEWS:

10:57:10  3          Q.   You don't know.  Why don't you

10:57:12  4   know?

10:57:14  5          A.   Because it was 2016, something

10:57:20  6   that happened eight years ago.

10:57:22  7          Q.   You're saying you just don't

10:57:23  8   remember?

10:57:25  9          A.   I don't remember.

10:57:27 10          Q.   You don't remember handing Dean

10:57:30 11   Dunn a document created by you dated

10:57:33 12   November 15, 2016?

10:57:35 13          MR. CALLAHAN:  Objection.  You can

10:57:36 14   answer.

10:57:40 15          THE WITNESS:  I don't remember.

10:57:44 16   BY MR. MATTHEWS:

10:57:44 17          Q.   Okay.  When did you create Exhibit

10:57:57 18   D?

10:57:57 19          A.   This was a compilation of notes

10:58:00 20   over an approximately one-year period.

10:58:06 21          Q.   Well, when did you begin creating

10:58:08 22   Exhibit D?

10:58:13 23          MR. CALLAHAN:  Objection.  You can

10:58:15 24   answer.

10:58:16 25          THE WITNESS:  On November 15, 2015.

18

BY MR. MATTHEWS:

Q.    So what did you do to create -- to begin creating this document on November 15, 2015?

A.    What did I do?

Q.    Uh-huh.  How did you create this document beginning on November 15, 2015?

A.    I was asked by Dean Dunn to keep a record of my concerns and so I created a new Word document and began adding notes over time.

Q.    When did Dean Dunn ask you to create such notes?

A.    Approximately 2015.

Q.    Approximately when in 2015?

A.    In the fall of 2015.

Q.    How did she communicate that?

A.    In a conversation.

Q.    In person or email or otherwise?

A.    I believe it was in person.

Q.    Were you surprised when she asked you to do that?

A.    I don't recall.

Q.    Had she ever asked you to create notes about any other faculty member prior to asking you to create notes regarding Dr. Elman?

19

11:00:05  1    MR. CALLAHAN:  Objection.  You can

11:00:07  2  answer.

11:00:08  3    THE WITNESS:  She had not.

11:00:10  4  BY MR. MATTHEWS:

11:00:10  5    Q.  Okay.  So you created this

11:00:17  6  document using, I believe you testified, Word?

11:00:21  7  You opened a Word document?

11:00:23  8    A.  I think so.

11:00:24  9    Q.  Okay.  And on what computer or

11:00:28 10  device did you open the Word document to begin

11:00:31 11  creating what has been now labeled Exhibit D?

11:00:39 12    A.  I don't recall.

11:00:42 13    Q.  Did you have access to a Wright

11:00:48 14  State University computer at the time Dean Dunn

11:00:51 15  asked you to create notes regarding Dr. Elman?

11:00:56 16    A.  I have had access to a Wright

11:01:00 17  State computer since 2003 and I sometimes used

11:01:07 18  my Wright State computer.  I sometimes used a

11:01:11 19  laptop because I work in multiple locations.

11:01:17 20    Q.  So at the time that Dr. Dunn asked

11:01:22 21  you to create notes regarding Dr. Elman, you

11:01:26 22  had access to a Wright State University desktop

11:01:30 23  computer, correct?

11:01:32 24    A.  To the best of my recollection, I

11:01:34 25  did.

20

11:01:34 1          Q.   Okay.  And the notes that you

11:01:43 2   created with respect to Dr. Elman, which has

11:01:48 3   now been labeled Exhibit D, would you have any

11:01:52 4   reason to have created them using your laptop

11:01:54 5   computer which you took to different locations

11:01:58 6   as opposed to using your desktop computer which

11:02:01 7   was presumably in your office?

11:02:05 8          A.   Would I have had a reason to --

11:02:08 9   can you repeat that?

11:02:10 10              MR. MATTHEWS:  Could you read back

11:02:10 11  the question, please?

11:02:32 12              COURT REPORTER:  And the notes that

11:01:43 13  you created with respect to Dr. Elman, which has

11:01:48 14  now been labeled Exhibit D, would you have any

11:01:52 15  reason to have created them using your laptop

11:01:54 16  computer which you took to different locations as

11:01:58 17  opposed to using your desktop computer which was

11:02:01 18  presumably in your office?

11:02:36 19              MR. CALLAHAN:  Objection.  You can

11:02:37 20  answer.

11:02:38 21              THE WITNESS:  For convenience.  I may

11:02:43 22  have used my laptop for convenience.

11:02:46 23  BY MR. MATTHEWS:

11:02:46 24         Q.   Okay.  So is it fair to say that

11:02:53 25  the first full paragraph, which begins 11-15,

21

11:02:59  1  that would have been a note created by you

11:03:02  2  using your Word software on November 15 of

11:03:09  3  2015?

11:03:23  4          A.   Can you repeat the question?

11:03:24  5                MR. MATTHEWS:  Please read back the

11:03:26  6  question.

11:03:38  7                COURT REPORTER:  So is it fair to say

11:02:51  8  that the first full paragraph, which begins 11-15,

11:02:59  9  that would have been a note created by you using

11:03:03 10  your Word software on November 15 of 2015?

11:03:41 11                THE WITNESS:  I would typically write

11:03:44 12  notes on Post-it notes if I was seeing patients or

11:03:49 13  if I was providing educational content, and then I

11:03:55 14  would use my notes when I had time to actually

11:04:00 15  type on the Word document.

11:04:03 16  BY MR. MATTHEWS:

11:04:03 17          Q.   I'm asking you specifically as to

11:04:06 18  the document that we've now identified as

11:04:08 19  Exhibit D.

11:04:13 20          A.   I don't know.  I don't remember.

11:04:16 21          Q.   What don't you remember?

11:04:18 22          A.   You're asking me if I converted

11:04:20 23  the notes onto a Word document on November 15,

11:04:29 24  2015, and I'm telling you I don't remember when

11:04:32 25  I converted my notes to a Word document.

22

11:04:35  1          Q.   Well, that wasn't my question but

11:04:37  2     let's talk about your answer.

11:04:39  3                So is it your testimony that in

11:04:44  4     November of 2015 you made notes on Post-it

11:04:51  5     notes regarding the concerns involving

11:04:55  6     Dr. Elman which are addressed in the first

11:04:59  7     paragraph of Exhibit D?

11:05:02  8                MR. CALLAHAN:  Objection.  You can

11:05:03  9     answer.

11:05:09  10                THE WITNESS:  I don't understand the

11:05:10  11    question.

11:05:14  12    BY MR. MATTHEWS:

11:05:15  13          Q.   What don't you understand about

11:05:16  14    that question?  I'm sorry.  I'm merely asking

11:05:19  15    you:  Is it your testimony that you created the

11:05:24  16    notes that are reflected in the first paragraph

11:05:26  17    of Exhibit D on a Post-it note as opposed to

11:05:30  18    opening a Word document?  That's my question.

11:05:33  19    It's a simple question.

11:05:34  20                MR. CALLAHAN:  Objection.  You can

11:05:35  21    answer.

11:05:36  22                THE WITNESS:  I told you that I would

11:05:41  23    write notes on Post-it notes, which is common for

11:05:45  24    me, and then when I have time, whether it's that

11:05:49  25    evening or whether it's the next morning -- this

23

11:05:54  1  series of circumstances occurred on November 15.

11:05:59  2  I don't remember exactly when I converted notes to

11:06:04  3  a Word document.

11:06:05  4  BY MR. MATTHEWS:

11:06:05  5      Q.  Well, you're speaking generically.

11:06:08  6  You're talking about you created notes.  I'm

11:06:10  7  talking about the notes regarding Dr. Elman.

11:06:12  8  At this point my question isn't about your

11:06:14  9  custom and practice.

11:06:16  10      I'm asking:  These notes that are

11:06:19  11  reflected in the first paragraph of Exhibit D,

11:06:24  12  were they created on a Post-it note or did you

11:06:27  13  use some other means to create these notes?

11:06:31  14      A.  I don't remember.

11:06:32  15      Q.  You don't remember.  So you might

11:06:34  16  have created them directly onto Word from your

11:06:37  17  memory; is that correct?

11:06:41  18      A.  I don't remember.

11:06:42  19      Q.  You don't remember.

11:06:43  20      A.  It was 2016 -- 2015.

11:06:46  21      Q.  All right.  But your testimony was

11:06:48  22  that you volunteered that your custom is you

11:06:51  23  would use Post-it notes to create notes about

11:06:55  24  events that you wanted to remember and then

11:06:57  25  later on at some point you would transcribe

24

| 11:07:00 | 1 | from Post-it notes onto a Word document.  Was |
| 11:07:05 | 2 | that your testimony? |
| 11:07:06 | 3 | A.   That's right. |
| 11:07:07 | 4 | Q.   All right.  And is it fair to say |
| 11:07:12 | 5 | that the notes which were reflected in the |
| 11:07:14 | 6 | first paragraph of Exhibit B [sic] would have |
| 11:07:17 | 7 | been created on or about November 15 of 2015. |
| 11:07:22 | 8 | MR. CALLAHAN:  Objection.  You can |
| 11:07:23 | 9 | answer. |
| 11:07:25 | 10 | THE WITNESS:  Exhibit B? |
| 11:07:27 | 11 | BY MR. MATTHEWS: |
| 11:07:27 | 12 | Q.   D.  I meant to say D.  If I spoke |
| 11:07:31 | 13 | B, I misspoke.  I'm talking about Exhibit D in |
| 11:07:33 | 14 | front of you. |
| 11:07:34 | 15 | A.   Can you repeat the question? |
| 11:07:35 | 16 | MR. MATTHEWS:  Please read it back. |
| 11:07:51 | 17 | COURT REPORTER:  And is it fair to |
| 11:07:11 | 18 | say that the notes which were reflected in the |
| 11:07:14 | 19 | first paragraph of Exhibit B (which should be D) |
| 11:07:16 | 20 | would have been created on or about November 15 of |
| 11:07:20 | 21 | 2015. |
| 11:07:58 | 22 | THE WITNESS:  To the best of my |
| 11:07:58 | 23 | recollection, yes. |
| 11:08:00 | 24 | BY MR. MATTHEWS: |
| 11:08:00 | 25 | Q.   Okay.  There's a second paragraph, |

25

11:08:08  1  which is also preceded by 11-15, is it fair to

11:08:13  2  say that those notes were created on or about

11:08:17  3  November 15, 2015?

11:08:22  4         A.   On or about, yes.

11:08:24  5         Q.   Okay.  And do you have a

11:08:28  6  recollection as to what kind of a delay there

11:08:33  7  was between when you made the notes, however

11:08:35  8  you made them, and when you entered them on

11:08:37  9  Exhibit D?  Was it typically within 24 hours?

11:08:41 10  Was it within a week?  Was it within a month?

11:08:44 11  Do you have any recollection of that?

11:08:46 12              MR. CALLAHAN:  Objection.  You can

11:08:47 13  answer.

11:08:47 14              THE WITNESS:  Generally within a

11:08:49 15  week.

11:08:49 16  BY MR. MATTHEWS:

11:08:49 17         Q.   Within a week.  Okay.  So it's

11:08:57 18  fair to say for each of the successive dates

11:09:01 19  that we see in Exhibit D, that the notes which

11:09:06 20  reflect the date were made on or about or

11:09:11 21  within a week of the date that is reflected on

11:09:15 22  the exhibit?

11:09:20 23         A.   On or about, yes.

11:09:21 24         Q.   Okay.  And that practice would

11:09:26 25  continue throughout all the dates noted on

26

11:09:30  1    Exhibit D, correct?

11:09:37  2            A.    Correct.

11:09:44  3            Q.    So by way of another example then,

11:09:47  4    referring to the first page, the note in the

11:09:52  5    third paragraph dated 3-1-16, you would have

11:09:56  6    created that on or about that date or within a

11:10:02  7    week of that date, correct?

11:10:03  8            A.    Which exhibit?

11:10:05  9            Q.    Exhibit D.

11:10:19  10           A.    I don't recall.

11:10:21  11           Q.    Is that your custom and practice?

11:10:26  12           A.    Is what my custom and practice?

11:10:29  13           Q.    Well, didn't you say your custom

11:10:30  14   and practice was after you made these notes,

11:10:33  15   you would convert them to the Word document

11:10:36  16   within a week?

11:10:39  17           A.    Typically.

11:10:40  18           Q.    Okay.  Do you have any reason to

11:10:42  19   believe you did not do that with respect to any

11:10:44  20   of the notes that are reflected in Exhibit D?

11:10:50  21           A.    Sure.  It depended on what my

11:10:53  22   schedule looked like because I manage seven

11:10:57  23   grants and three clinical settings and teaching

11:11:01  24   at multiple locations.

11:11:03  25           Q.    So it would have been more than a

27

11:11:05 1  week?  Is that what you're saying?

11:11:06 2          A.    Sure.

11:11:06 3          Q.    How long could it have been?

11:11:10 4          A.    It varied.

11:11:13 5          Q.    With respect to Dr. Elman, what

11:11:15 6  kind of variation would there have been, the

11:11:19 7  range?

11:11:21 8                MR. CALLAHAN:  Objection.  You can

11:11:22 9  answer.

11:11:26 10               THE WITNESS:  I don't recall

11:11:26 11 specifics.

11:11:27 12 BY MR. MATTHEWS:

11:11:27 13          Q.    I'm not asking specifics.  I'm

11:11:29 14 talking about the range.  Your testimony

11:11:31 15 earlier was that it was within a week.

11:11:35 16          A.    Typically.

11:11:36 17          Q.    Okay.  Now you're indicating

11:11:38 18 sometimes it was more than a week, correct?

11:11:42 19          A.    You're asking me for details.

11:11:45 20          Q.    Yes.

11:11:45 21          A.    So I'm answering that question.  I

11:11:48 22 don't recall.

11:11:49 23          Q.    Well, I'm asking for the range.

11:11:52 24               MR. CALLAHAN:  Objection.  You can

11:11:54 25 answer again.

28

11:11:59  1  BY MR. MATTHEWS:

11:11:59  2      Q.   Do you understand the question?

11:12:01  3      A.   I do understand the question.

11:12:02  4      Q.   Okay.  Can you answer the

11:12:04  5  question?

11:12:09  6      A.   It varied according to my

11:12:12  7  schedule.

11:12:12  8      Q.   I understand.

11:12:13  9      A.   Can I finish?

11:12:15  10      Q.   Absolutely.  I thought you were

11:12:16  11  finished.  Go on.

11:12:19  12      A.    It varied according to my

11:12:20  13  schedule.  So it was typical for me to go

11:12:26  14  through my notes and convert them usually

11:12:31  15  within a week, but that likely wasn't always

11:12:35  16  the case.

11:12:35  17      Q.   Okay.  So what would be the

11:12:38  18  maximum amount of time you might have taken to

11:12:40  19  convert notes to your Word document?

11:12:43  20          MR. CALLAHAN:  Objection.  You can

11:12:44  21  answer.

11:12:45  22  BY MR. MATTHEWS:

11:12:46  23      Q.   With respect to Exhibit D.

11:12:48  24      A.   I don't --

11:12:50  25          MR. CALLAHAN:  Objection.  You can

29

11:12:51 1  answer.

11:12:51 2              THE WITNESS:  I don't know.  I don't

11:12:52 3  recall.  It was 2015.

11:12:54 4  BY MR. MATTHEWS:

11:12:54 5        Q.   So it could have been -- you could

11:12:56 6  have taken, what, a year after the event was

11:12:58 7  recorded?  You might have taken a year to write

11:13:01 8  the note out?

11:13:05 9        A.   I might have.

11:13:07 10       Q.   Okay.  All right.  You would agree

11:13:18 11 that the task which Dean Dunn gave you involved

11:13:23 12 a very serious matter, correct?

11:13:27 13             MR. CALLAHAN:  Objection.  You can

11:13:27 14 answer.

11:13:29 15             THE WITNESS:  Yes.

11:13:30 16 BY MR. MATTHEWS:

11:13:30 17       Q.   And notwithstanding the serious

11:13:33 18 nature of that task, your testimony this

11:13:35 19 morning is it might take you up to a year to

11:13:38 20 transcribe notes from a Post-it note.  Is that

11:13:43 21 your testimony?

11:13:44 22             MR. CALLAHAN:  Objection.  You can

11:13:44 23 answer.

11:13:48 24             THE WITNESS:  It wasn't my typical

11:13:50 25 practice.

11:13:50  1  BY MR. MATTHEWS:

11:13:50  2          Q.   I understand.  But you told me

11:13:53  3  under oath that you might take a year.  It

11:13:55  4  might have been a year, correct, or are you

11:13:58  5  changing your answer?

11:14:01  6          A.   So I'm telling you that my typical

11:14:04  7  practice was to do it as soon as possible but

11:14:08  8  given my schedule and my on-call duties --

11:14:12  9          Q.   It could have taken a year?

11:14:14  10          MR. CALLAHAN:  Objection.  You can

11:14:16  11  answer if Mr. Matthews lets you finish.

11:14:18  12          MR. MATTHEWS:  I thought she was

11:14:20  13  done.

11:14:21  14  BY MR. MATTHEWS:

11:14:21  15          Q.   Were you not done?

11:14:23  16          A.   No.

11:14:24  17          Q.   Go ahead then.

11:14:27  18          A.   I said that it was typical for me

11:14:30  19  to transfer the notes into a Word document so

11:14:34  20  that it was professional, and I made every

11:14:39  21  effort to do that within a week, but it would

11:14:43  22  not surprise me if it took longer than that at

11:14:48  23  times.

11:14:49  24          Q.   And your testimony earlier was

11:14:51  25  that it could have taken up to a year?

31

11:14:56 1        A.   It wouldn't have taken me up to a

11:14:58 2   year.  I was trying to make a comment -- you

11:15:02 3   were asking me for specifics because I told you

11:15:05 4   what my common practice was.

11:15:08 5        Q.   Okay.

11:15:09 6        A.   And you didn't seem to want to

11:15:11 7   accept that as an answer.

11:15:12 8        Q.   I want to accept the truth, ma'am.

11:15:14 9        MR. CALLAHAN:  Mr. Matthews, you're

11:15:16 10  interrupting Dr. Gentile again.  If you're going

11:15:19 11  to ask her the same question ten different times,

11:15:23 12  you should allow her to respond ten times.

11:15:25 13  BY MR. MATTHEWS:

11:15:25 14       Q.   Go ahead.  Feel free.  Take

11:15:26 15  whatever time you need.

11:15:29 16       A.   I don't recall the specifics

11:15:32 17  because it was 2015.

11:15:35 18       Q.   Are you done?  Are you done with

11:15:41 19  your answer, ma'am?

11:15:43 20       A.   I am done with my answer.

11:15:44 21       Q.   Okay.  So are you changing your

11:15:47 22  testimony from earlier this morning that the

11:15:49 23  notes reflected on Exhibit A, it might have

11:15:52 24  taken up to a year to transcribe them from

11:15:56 25  Post-it notes onto this document?

32

11:15:59  1          MR. CALLAHAN:  Objection.  You can

11:16:01  2  answer.

11:16:02  3          THE WITNESS:  It typically took me a

11:16:04  4  week but it might have taken longer and I don't

11:16:06  5  recall the specifics.

11:16:09  6  BY MR. MATTHEWS:

11:16:10  7      Q.   I understand that.  That wasn't my

11:16:11  8  question.  Do you want her to read back the

11:16:15  9  question?  Would that help?  Would you like me

11:16:18 10  to have the court reporter read back the

11:16:19 11  question?

11:16:19 12      A.   That's fine.

11:16:20 13          MR. MATTHEWS:  Please read back the

11:16:22 14  question.

11:16:39 15          COURT REPORTER:  So are you changing

11:15:46 16  your testimony from earlier this morning that the

11:15:49 17  notes reflected on Exhibit A, it might have taken

11:15:53 18  up to a year to transcribe them from Post-it notes

11:15:59 19  onto this document?

11:16:41 20          THE WITNESS:  You mentioned up to a

11:16:42 21  year.  That was your comment that you made.

11:16:48 22  Because I told you that I didn't recall the

11:16:50 23  details.  That apparently wasn't sufficient for

11:16:54 24  you so you started giving me various timelines as

11:17:01 25  an alternative.

33

11:17:02  1    BY MR. MATTHEWS:

11:17:03  2         Q.   Ma'am, the record speaks for

11:17:04  3    itself.

11:17:05  4         A.   Okay.

11:17:05  5         Q.   You're not answering the question.

11:17:07  6    Please answer the question.

11:17:08  7              MR. CALLAHAN:  Objection.  I think

11:17:11  8    she's responded to that question several times,

11:17:13  9    Mr. Matthews.

11:17:14 10              MR. MATTHEWS:  I don't believe she

11:17:15 11    has.  Read the question back again.  Please just

11:17:18 12    answer the question.

11:17:19 13              COURT REPORTER:  So are you changing

11:15:46 14    your testimony from earlier this morning that the

11:15:49 15    notes reflected on Exhibit A, it might have taken

11:15:53 16    up to a year to transcribe them from Post-it notes

11:15:59 17    onto this document?

11:17:44 18              MR. CALLAHAN:  Objection.  You can

11:17:45 19    answer.

11:17:48 20              THE WITNESS:  My testimony, to

11:17:50 21    clarify, is that because of the demands of my job,

11:17:56 22    I will take notes on Post-it notes, secure them,

11:18:01 23    and then when I have time at my earliest

11:18:04 24    convenience, I would transfer them to a Word

11:18:09 25    document.  It was common for me to take up to a

34

11:18:16  1  week in most cases, but it's possible that it

11:18:19  2  would have taken longer in some instances.  I

11:18:23  3  don't recall -- I don't recall additional details

11:18:30  4  over and above that.

11:18:31  5  BY MR. MATTHEWS:

11:18:31  6        Q.   Okay.  I would like to probe

11:18:33  7  further into your comment that it might have

11:18:36  8  taken longer.  If you could explain when you're

11:18:39  9  talking about longer than a week, how much

11:18:42  10  longer than a week might it have taken?

11:18:44  11        A.   I didn't document that.

11:18:46  12        Q.   I'm not asking if you documented

11:18:49  13  it.  You just stated -- you testified under

11:18:52  14  oath it might have taken longer than a week.

11:18:55  15  I'm asking, how much longer?

11:19:00  16        A.   I don't remember.

11:19:01  17        Q.   Okay.  Could it have taken a year?

11:19:05  18        A.   No.

11:19:06  19        Q.   Could it have taken 11 months?

11:19:11  20        A.   I don't recall.

11:19:13  21        Q.   Could it have taken ten months?

11:19:18  22        A.   I don't recall.

11:19:18  23        Q.   Could it have taken nine months?

11:19:23  24        A.   I don't recall.

11:19:24  25        Q.   Could it have taken eight months?

35

| | | |
|---|---|---|
| 11:19:28 | 1 | A.    I don't recall. |
| 11:19:29 | 2 | Q.    Could it have taken seven months? |
| 11:19:33 | 3 | A.    I don't recall. |
| 11:19:34 | 4 | Q.    Could it have taken six months? |
| 11:19:38 | 5 | A.    I don't recall. |
| 11:19:39 | 6 | Q.    Could it have taken five months? |
| 11:19:42 | 7 | A.    I don't recall. |
| 11:19:42 | 8 | Q.    Could it have taken four months? |
| 11:19:44 | 9 | A.    I don't recall. |
| 11:19:46 | 10 | Q.    Could it have taken three months? |
| 11:19:49 | 11 | A.    I don't recall. |
| 11:19:50 | 12 | Q.    Could it have taken two months? |
| 11:19:53 | 13 | A.    I don't recall. |
| 11:19:54 | 14 | Q.    Could it have taken one month? |
| 11:19:57 | 15 | A.    I don't recall. |
| 11:19:58 | 16 | Q.    Okay.  So notwithstanding the |
| 11:20:05 | 17 | serious nature of the charge given to you, |
| 11:20:09 | 18 | according to your testimony, by Dr. Dunn, you |
| 11:20:11 | 19 | don't recall how long it took you to transcribe |
| 11:20:15 | 20 | the notes onto this document? |
| 11:20:19 | 21 | MR. CALLAHAN:  Objection.  You can |
| 11:20:20 | 22 | answer. |
| 11:20:21 | 23 | THE WITNESS:  I have already answered |
| 11:20:22 | 24 | that question. |
| 11:20:23 | 25 | BY MR. MATTHEWS: |

36

11:20:23  1          Q.   Okay.  Let's turn to the third

11:20:46  2   page of Exhibit D.  In the bottom right-hand

11:21:04  3   corner you should see a Bates stamp number

11:21:09  4   000160.  Do you see that?

11:21:16  5          A.   Yes.

11:21:16  6          Q.   All right.  So let's go to the

11:21:19  7   first full paragraph.  It's headed 6-21-16.  Do

11:21:25  8   you see that?

11:21:26  9          A.   Yes.

11:21:26 10          Q.   All right.  So is it fair to say

11:21:30 11   that in the normal course you would have

11:21:33 12   transcribed those notes within about a week of

11:21:40 13   June 21, 2016?

11:21:49 14          A.   I believe so.

11:21:50 15          Q.   Okay.  How was it on June 21 of

11:21:58 16   2016, within a week of that date, that you were

11:22:02 17   able to foretell what occurred on August 4 of

11:22:06 18   2016?

11:22:13 19          A.   So when I took these notes, I had

11:22:17 20   been -- this was specifically about Dr. Weston.

11:22:20 21   So I had been waiting to wrap this up and come

11:22:27 22   to a conclusion since she had been interviewed

11:22:32 23   in June of that year.  So I would have gone

11:22:37 24   back and added in the final step of that

11:22:44 25   communication.

11:22:47　1　　　　Q.　So if I'm understanding your

11:22:49　2　testimony, the note that is dated 6-21-16 was

11:22:56　3　created sometime after August 4, 2016?  Is that

11:23:02　4　your testimony?

11:23:04　5　　　　A.　I would have entered the first

11:23:05　6　several sentences of that.  Then when this

11:23:10　7　issue was resolved, I would have gone back and

11:23:13　8　added in that there had been some finality on

11:23:22　9　August 4 of 2016.

11:23:25　10　　　　Q.　So in answer to my question, the

11:23:27　11　note that is dated 6-21-16 was actually

11:23:32　12　completed sometime after August 4, 2016,

11:23:39　13　correct?

11:23:40　14　　　　A.　It would have been an addition --

11:23:43　15　　　　Q.　Okay.

11:23:44　16　　　　A.　-- to the note.

11:23:45　17　　　　Q.　All right.  Did you do that for

11:23:46　18　other notes too?

11:23:52　19　　　　A.　I don't know.  I may have.  My

11:23:58　20　goal was to document things that had happened

11:24:01　21　and then -- instead of adding another note in

11:24:07　22　August so that I had various content separated

11:24:12　23　from each other.

11:24:13　24　　　　Q.　So on your device, your electronic

11:24:17　25　device, your desktop computer, your laptop,

38

11:24:21 1 you're continuously editing these notes.  Is

11:24:24 2 that your testimony?

11:24:25 3            MR. CALLAHAN:  Objection.  You can

11:24:26 4 answer.

11:24:26 5            THE WITNESS:  If there was something

11:24:28 6 relevant to that note, then I did edit.  And

11:24:34 7 that's an example of that.

11:24:35 8 BY MR. MATTHEWS:

11:24:35 9       Q.   Okay.  Do you still have the

11:24:37 10 device upon which you made those edits?

11:24:42 11       A.   I don't.

11:24:43 12       Q.   What happened to it?

11:24:46 13       A.   I would have purchased a new

11:24:48 14 computer.  I purchased a new computer I think

11:24:52 15 two years ago.

11:24:54 16       Q.   Two years ago, that would have

11:24:56 17 been 2022.  What did you do with the computer

11:25:00 18 that you had used to make these notes?

11:25:02 19            MR. CALLAHAN:  Objection.  You can

11:25:03 20 answer.

11:25:06 21            THE WITNESS:  I actually don't know.

11:25:07 22 My husband takes care of that.

11:25:13 23 BY MR. MATTHEWS:

11:25:13 24       Q.   You received a copy of the

11:25:15 25 litigation hold in February of 2017, did you

11:25:19 1    not?

11:25:22 2           A.    Yes.

11:25:23 3           Q.    Notwithstanding that, you did not

11:25:26 4    preserve that computer?

11:25:27 5           MR. CALLAHAN:  Objection.  You can

11:25:28 6    answer.

11:25:29 7           THE WITNESS:  It wasn't a Wright

11:25:30 8    State computer.

11:25:31 9    BY MR. MATTHEWS:

11:25:31 10          Q.    I'm not saying it was.

11:25:33 11          A.    My understanding was that I was to

11:25:37 12   preserve all of my Wright State communications

11:25:40 13   and Wright State electronics.

11:25:43 14          Q.    Your understanding of the

11:25:45 15   litigation hold was that it did not involve the

11:25:49 16   computer that you used to create notes about

11:25:52 17   Dr. Elman?

11:25:53 18          MR. CALLAHAN:  Objection.  You can

11:25:54 19   answer.

11:25:57 20          THE WITNESS:  That was my

11:25:57 21   understanding.

11:25:58 22   BY MR. MATTHEWS:

11:25:59 23          Q.    And you read the litigation hold?

11:26:01 24          A.    I did.

11:26:02 25          Q.    Okay.  You're aware that on the

40

11:26:22  1  Wright State University website you're listed

11:26:27  2  as a full-time faculty member; is that correct?

11:26:33  3          A.   I haven't checked it but that

11:26:36  4  would be my understanding.

11:26:37  5          Q.   And your curriculum vitae is

11:26:42  6  available on that web page; is that correct?

11:26:46  7          A.   A version of it is as far as I

11:26:50  8  know.

11:26:51  9          Q.   What do you mean a version of it?

11:26:53 10          A.   So we -- as faculty members we

11:26:58 11  can -- I believe we can go onto the website and

11:27:00 12  update our CV serially if there are changes and

11:27:09 13  updates, maybe annually.  Most of us do that.

11:27:13 14          Q.   You would agree that a CV is a

11:27:15 15  very important document, is it not?

11:27:19 16          A.   Yes.

11:27:20 17          Q.   And a CV, the information

11:27:23 18  contained in the CV, you would expect that to

11:27:25 19  be relied upon by a number of people, correct?

11:27:30 20          A.   I imagine so.

11:27:32 21          Q.   So a CV, you would be expected to

11:27:38 22  ensure that the information on the CV is

11:27:42 23  completely accurate, would you not?

11:27:44 24              MR. CALLAHAN:  Objection.  You can

11:27:45 25  answer.

11:27:47 1          THE WITNESS: I imagine so.

11:27:49 2 BY MR. MATTHEWS:

11:27:49 3          Q.   Why do you just imagine so?  Why

11:27:52 4 are you using the word imagine?  I'm not asking

11:27:55 5 for imagination here.  I'm asking a question.

11:27:58 6          MR. CALLAHAN: Objection.

11:27:59 7 BY MR. MATTHEWS:

11:27:59 8          Q.   Would you expect -- you would

11:28:02 9 expect that the information on a curriculum

11:28:06 10 vitae that you create would be accurate?

11:28:08 11          MR. CALLAHAN: Objection.  You can

11:28:08 12 answer.

11:28:10 13          THE WITNESS: Yes.

11:28:11 14 BY MR. MATTHEWS:

11:28:11 15          Q.   Okay.  Thank you.  The information

11:28:15 16 on your CV is not accurate though, is it?

11:28:18 17          MR. CALLAHAN: Objection.  You can

11:28:20 18 answer.

11:28:22 19          THE WITNESS: I don't know what

11:28:22 20 you're referring to.

11:28:24 21 BY MR. MATTHEWS:

11:28:24 22          Q.   Well, let me hand you Exhibit I.

11:28:27 23          (Thereupon, Plaintiff's Exhibit I:

11:28:27 24 Curriculum vitae, was marked for purposes of

11:28:32 25 identification.)

42

11:28:32  1    BY MR. MATTHEWS:

11:28:33  2           Q.   Do you recognize Exhibit I?

11:28:35  3                MR. CALLAHAN:  I'm going to note an

11:28:37  4    objection to questions of this witness about a

11:28:39  5    document that's not Bates stamped and hasn't been,

11:28:42  6    you know, kind of produced to counsel as an

11:28:45  7    exhibit for the case.

11:28:46  8                MR. MATTHEWS:  Objection noted.

11:28:48  9                MR. CALLAHAN:  I object to all

11:28:50 10    questions to the witness about this document.

11:28:52 11    BY MR. MATTHEWS:

11:28:52 12           Q.   You may answer the question,

11:28:54 13    ma'am.

11:28:57 14           A.   What was the question?

11:28:59 15           Q.   Do you recognize Exhibit I?

11:29:03 16           A.   I do.

11:29:04 17           Q.   What is Exhibit I?

11:29:06 18           A.   It's a -- it appears to be a 2022

11:29:11 19    version of my CV.

11:29:13 20           Q.   This is the version that is

11:29:15 21    available on the website as of today, correct?

11:29:19 22                MR. CALLAHAN: Objection.  You can

11:29:21 23    answer.

11:29:22 24                THE WITNESS:  I don't know.  I didn't

11:29:23 25    check the website today.

43

11:29:25  1  BY MR. MATTHEWS:

11:29:26  2          Q.   Have you changed the CV on your

11:29:28  3  website recently?

11:29:32  4          A.   I don't recall.

11:29:34  5          Q.   You don't recall.  And my question

11:29:37  6  is, the information --

11:29:39  7              MR. CALLAHAN:  Mr. Matthews, I am

11:29:40  8  going to object to this line of questioning

11:29:42  9  because we've had this conversation before in

11:29:45 10  another deposition and at hearings where when you

11:29:48 11  bring documents that you haven't produced to

11:29:49 12  opposing counsel that you intend to use as an

11:29:52 13  exhibit in this case, it's not proper.  We've done

11:29:54 14  a lot of document exchange and you're pulling a

11:29:56 15  document that you haven't produced to opposing

11:29:58 16  counsel and want to use it as an exhibit in a

11:30:02 17  deposition.  That is improper.

11:30:03 18              MR. MATTHEWS:  Objection noted.

11:30:04 19              MR. CALLAHAN:  I think you should end

11:30:05 20  this line of questioning.

11:30:06 21              MR. MATTHEWS:  Objection noted.  I'm

11:30:08 22  not ending this line of questioning.

11:30:12 23  BY MR. MATTHEWS:

11:30:12 24          Q.   Please answer the question.

11:30:14 25              MR. CALLAHAN:  What's the question?

44

11:30:15  1          MR. MATTHEWS:  Read back the

11:30:16  2   question.

11:30:29  3          COURT REPORTER:  Have you changed the

11:29:27  4   CV on your website recently?

11:30:32  5          THE WITNESS:  I'm not sure because I

11:30:34  6   applied for a job about six months ago and I can't

11:30:38  7   recall if I updated my CV and uploaded a new copy.

11:30:45  8   BY MR. MATTHEWS:

11:30:46  9       Q.   The information on Exhibit I,

11:30:51 10   which is a CV dated June 2022, is not

11:30:55 11   completely accurate, is it?

11:30:57 12          MR. CALLAHAN:  Objection.  I think,

11:31:01 13   Mr. Matthews, you should direct the witness to

11:31:04 14   whatever issue you have with something in the

11:31:10 15   document marked Plaintiffs' Exhibit I for

11:31:11 16   identification purposes.

11:31:13 17          MR. MATTHEWS:  Well, with all due

11:31:14 18   respect, during your depositions you can direct

11:31:17 19   the witness as you wish without my interference,

11:31:20 20   and I would ask that you give me the same respect.

11:31:22 21          MR. CALLAHAN:  Well, I would ask that

11:31:23 22   you produce documents that you intend to use in

11:31:26 23   the case through the rules of discovery.  You've

11:31:28 24   not done that with Exhibit I.

11:31:30 25          MR. MATTHEWS:  Objection noted.  This

11:31:31   1   is a public record.

11:31:34   2   BY MR. MATTHEWS:

11:31:34   3        Q.   You may answer the question.

11:31:37   4        A.   What's the question?

11:31:39   5        Q.   This is not accurate, is it?  The

11:31:41   6   information contained in Exhibit I is not

11:31:44   7   accurate?

11:31:44   8        MR. CALLAHAN:  Objection.  You can

11:31:45   9   answer.

11:31:46  10        THE WITNESS:  I don't know what

11:31:47  11   you're referring to.

11:31:51  12   BY MR. MATTHEWS:

11:31:51  13        Q.   Exhibit I.  Is all the information

11:31:56  14   in Exhibit I accurate and correct?

11:31:59  15        MR. CALLAHAN:  Objection.  You can

11:32:00  16   answer.

11:33:40  17        THE WITNESS:  I don't have all of my

11:33:41  18   presentations listed on this version.

11:33:44  19   BY MR. MATTHEWS:

11:33:45  20        Q.   That wasn't my question.  Is the

11:33:46  21   information on Exhibit I, is it all accurate,

11:33:50  22   the information that is contained on Exhibit I?

11:33:52  23        MR. CALLAHAN:  Objection.  You can

11:33:53  24   answer.

11:34:01  25        THE WITNESS:  I'm not sure.  As far

46

11:34:03 1  as I know.

11:34:06 2  BY MR. MATTHEWS:

11:34:06 3          Q.   Okay.   You testified earlier you

11:34:08 4  agree that it's important to be accurate with

11:34:11 5  all information that you put on a curriculum

11:34:15 6  vitae, correct?

11:34:16 7          MR. CALLAHAN:   Objection.   I'm

11:34:18 8  objecting again to this entire line of questioning

11:34:20 9  where you would have two different documents,

11:34:21 10 Exhibit A and D, with a different font and spend

11:34:25 11 30 to 45 minutes questioning the witness about

11:34:27 12 that and then bring a document that hasn't been

11:34:30 13 produced to counsel and the witness has not had a

11:34:35 14 chance to review, as far as we know, prior to the

11:34:38 15 deposition.

11:34:38 16         MR. MATTHEWS:   With all due respect,

11:34:40 17 Rory --

11:34:40 18         MR. CALLAHAN:   With all due respect,

11:34:40 19 you understand the point.

11:34:41 20         MR. MATTHEWS:   No speaking

11:34:42 21 objections.

11:34:42 22         MR. CALLAHAN:   Well, I've tried to

11:34:43 23 refrain from that but I think there's certain

11:34:45 24 ground rules that you should follow as well during

11:34:48 25 the course of discovery.

11:34:49 1                MR. MATTHEWS:  I don't believe I have

11:34:50 2    violated --

11:34:51 3                MR. CALLAHAN:  Producing documents

11:34:53 4    that you're going to rely on as an exhibit in the

11:34:56 5    case to opposing counsel.

11:34:57 6                MR. MATTHEWS:  Your objection is

11:34:58 7    noted.  Thank you.

11:34:59 8    BY MR. MATTHEWS:

11:35:00 9          Q.    You may answer the question.

11:35:02 10         A.    What was the question?

11:35:03 11         Q.    You agree that you would want to

11:35:06 12   make sure that any information you put into a

11:35:09 13   curriculum vitae is accurate?

11:35:14 14         A.    Yes.

11:35:15 15         Q.    Okay.  Now, this Exhibit I, this

11:35:19 16   curriculum vitae indicates on the first page

11:35:23 17   that you held a position of interim chair at

11:35:27 18   Wright State University, Dayton, Ohio in 2016,

11:35:30 19   does it not?

11:35:32 20                MR. CALLAHAN:  Objection.  You can

11:35:33 21   answer.

11:35:38 22                THE WITNESS:  My understanding is

11:35:39 23   that Dean Dunn named me interim chair at a

11:35:44 24   gathering at Elizabeth Place in the sixth floor

11:35:49 25   auditorium, and that was very public in front of

48

11:35:54 1    many people and that was in 2016.

11:36:06 2                    (Thereupon, Plaintiff's Exhibit 31:

11:36:06 3    12-5-16 letter from Dr. Dunn, was marked for

11:36:07 4    purposes of identification.)

11:36:07 5    BY MR. MATTHEWS:

11:36:07 6           Q.    I'm handing you what I've labeled

11:36:09 7    Exhibit 31.  Have you seen this document

11:36:11 8    before?

11:36:16 9           A.    Have I seen the document before?

11:36:18 10          Q.    That was my question.

11:36:19 11          A.    I don't believe so.  That's my

11:36:21 12   answer.

11:36:21 13          Q.    Take your time and read

11:36:24 14   Exhibit 31.  I will represent this was a

11:36:28 15   document produced by the defendant, Bates

11:36:31 16   stamped 155.  It is a letter from Margaret M.

11:36:36 17   Dunn, Dean, dated December 5, 2016 addressed to

11:36:41 18   Igor Elman.  Would you agree?

11:36:43 19          A.    Sure.

11:36:44 20          Q.    All right.  Can you read the first

11:36:47 21   sentence?

11:36:50 22          A.    I'm writing to inform you of my

11:36:52 23   decision to remove you from the position of

11:36:53 24   chair, Department of Psychiatry, Wright State

11:36:57 25   University Boonshoft School of Medicine and

49

11:36:58 1 Wright State Physicians, effective December 31,

11:37:03 2 2016.

11:37:03 3      Q.  All right.  So it's fair to say

11:37:06 4 that Dr. Elman was the chair, Department

11:37:11 5 Psychiatry, Wright State University Boonshoft

11:37:14 6 School of Medicine and Wright State Physicians,

11:37:16 7 until December 31, 2016?

11:37:19 8         MR. CALLAHAN:  Objection.  You can

11:37:20 9 answer.

11:37:23 10         THE WITNESS:  I just read it to you.

11:37:26 11 BY MR. MATTHEWS:

11:37:26 12      Q.  All right.  Do you dispute

11:37:28 13 anything that is stated in that first sentence

11:37:31 14 of Dr. Dunn's letter?

11:37:33 15         MR. CALLAHAN:  Objection.  You can

11:37:34 16 answer.

11:37:34 17         THE WITNESS:  No.

11:37:35 18 BY MR. MATTHEWS:

11:37:35 19      Q.  All right.  Yet on your CV you

11:37:39 20 hold out that you were the interim chair in

11:37:43 21 2016?

11:37:44 22         MR. CALLAHAN:  Objection.

11:37:45 23 BY MR. MATTHEWS:

11:37:45 24      Q.  That's inconsistent with

11:37:46 25 Dr. Dunn's letter, is it not?

50

11:37:48  1          MR. CALLAHAN:  Objection.  You can

11:37:48  2  answer.

11:37:48  3          THE WITNESS:  It is.

11:37:49  4  BY MR. MATTHEWS:

11:37:50  5      Q.   Okay.  Thank you.  You indicated

11:37:56  6  there were some presentations that do not

11:37:58  7  appear on your CV, correct?

11:38:00  8          MR. CALLAHAN:  Objection.  You can

11:38:00  9  answer.

11:38:01  10          THE WITNESS:  Correct.

11:38:02  11  BY MR. MATTHEWS:

11:38:03  12      Q.   Isn't it also true that you did

11:38:04  13  not disclose that you had worked as a nurse on

11:38:08  14  this CV?

11:38:09  15          MR. CALLAHAN:  Objection.  You can

11:38:10  16  answer.

11:38:11  17          THE WITNESS:  I was in nursing school

11:38:13  18  but I never worked as a nurse.

11:38:14  19  BY MR. MATTHEWS:

11:38:14  20      Q.   Okay.  Why is that not listed

11:38:30  21  under education?

11:38:33  22      A.   I completed --

11:38:34  23          MR. CALLAHAN:  Objection.  You can

11:38:35  24  answer.

11:38:35  25          THE WITNESS:  I completed two years

*MIAMI VALLEY REPORTING, LLC  (937) 440-1400*

51

11:38:37 1  of undergraduate work in the nursing program at

11:38:41 2  Wright State University and did not receive a

11:38:43 3  degree.  I resumed school and completed premedical

11:38:48 4  studies in psychology.

11:38:51 5  BY MR. MATTHEWS:

11:38:51 6        Q.   That's why you did not include

11:38:52 7  your nursing education on the curriculum vitae?

11:38:58 8             MR. CALLAHAN:  Objection.  You can

11:39:00 9  answer.

11:39:00 10            THE WITNESS:  It was part of my

11:39:01 11 undergraduate work.  And since I didn't receive a

11:39:05 12 degree, it doesn't appear on my CV.

11:39:17 13 BY MR. MATTHEWS:

11:39:17 14       Q.   Let's go back to Exhibit D for a

11:39:22 15 bit.  Do you have that in front of you?  Do you

11:39:35 16 have that in front of you?

11:39:36 17       A.   I do.

11:39:36 18       Q.   Okay.  Thank you.  Now, you

11:39:38 19 indicated you handed this document to Dr. Dunn;

11:39:45 20 is that correct?

11:39:45 21       A.   I -- Dr. Al Painter was visiting

11:39:53 22 our department and he knew that I had the

11:39:57 23 document, so he asked if he could deliver it

11:40:01 24 for me on my behalf.  So I put it in a manila

11:40:06 25 envelope and handed it to Dr. Painter.  So he

52

11:40:10  1  hand-delivered it to Dr. Dunn.  He was on the

11:40:12  2  way to her office.

11:40:16  3          Q.   Why did you not -- you did not

11:40:18  4  engage in any email correspondence with

11:40:21  5  Dr. Painter regarding Dr. Elman?

11:40:25  6          MR. CALLAHAN:  Objection.  You can

11:40:26  7  answer.

11:40:30  8          THE WITNESS:  I don't recall.

11:40:34  9  BY MR. MATTHEWS:

11:40:38 10          Q.   No documents were produced?

11:40:40 11          MR. CALLAHAN:  Objection to that

11:40:42 12  characterization on the record.  You can answer.

11:40:44 13          MR. MATTHEWS:  Well, she was asked to

11:40:46 14  bring with her all documents related to Dr. Dunn.

11:40:52 15  You've got the Exhibit 32, Mr. Callahan.

11:40:58 16          MR. CALLAHAN:  I'm going to object to

11:41:00 17  that characterization on the record.  You can

11:41:04 18  restate your question and she can answer the

11:41:07 19  question.

11:41:10 20          MR. MATTHEWS:  I'm not going to

11:41:11 21  restate my question.  I can read it back again.

11:41:13 22          MR. CALLAHAN:  Okay.

11:41:31 23          COURT REPORTER:  You did not engage

11:40:18 24  in any email correspondence with Dr. Painter

11:40:21 25  regarding Dr. Elman?

53

11:41:32  1          MR. CALLAHAN:  Same objection.  You

11:41:33  2   can answer.

11:41:37  3          THE WITNESS:  I don't recall my

11:41:38  4   emails from 2015 or '16.

11:41:40  5   BY MR. MATTHEWS:

11:41:40  6      Q.   Is it fair to say that you were a

11:41:41  7   regular user of email during that period of

11:41:44  8   time?

11:41:47  9      A.   For work purposes, yes.

11:41:50 10      Q.   And matters related to Dr. Elman

11:41:53 11   would have been work purpose, correct?

11:41:56 12      A.   Yes.

11:42:02 13      Q.   Is there any reason you would not

11:42:04 14   have emailed Dean Dunn Exhibit D?

11:42:10 15          MR. CALLAHAN:  Objection.  You can

11:42:11 16   answer.

11:42:15 17          THE WITNESS:  In my professional

11:42:16 18   opinion, it was a better idea to hand-deliver it

11:42:21 19   to her.

11:42:23 20   BY MR. MATTHEWS:

11:42:23 21      Q.   Why was it a better idea to have

11:42:25 22   Dr. Painter hand-deliver your letter?

11:42:28 23      A.   Because he was an associate dean

11:42:30 24   of faculty affairs and professional

11:42:33 25   development, and I considered him her

54

11:42:39 1  right-hand person.  They worked very closely

11:42:45 2  together.

11:42:46 3       Q.   Okay.  Help me understand why that

11:42:50 4  was preferred as opposed to emailing Dean Dunn

11:42:54 5  directly.

11:42:54 6            MR. CALLAHAN:  Objection.  You can

11:42:55 7  answer.

11:42:56 8            THE WITNESS:  I don't think it was

11:42:57 9  preferred necessarily but Dr. Painter was in our

11:43:00 10 department to teach and I saw him and we spoke for

11:43:06 11 a couple of minutes.  I mentioned to him that I

11:43:09 12 was going to get the document to Dean Dunn.  And

11:43:14 13 he said, well, I'm on my way there now, if you

11:43:16 14 want me to take care of that for you.

11:43:19 15 BY MR. MATTHEWS:

11:43:20 16      Q.   And you had the document in your

11:43:22 17 hands at that time?

11:43:23 18      A.   We were in our department, in our

11:43:25 19 office suite.

11:43:29 20      Q.   Okay.  You had the document in

11:43:31 21 your hands and then you handed it to

11:43:33 22 Dr. Painter.  Is that your testimony?

11:43:35 23      A.   I had the document in my office,

11:43:39 24 secured in my office, and then I gave it to

11:43:42 25 Dr. Painter.

11:43:43  1          Q.    Had it been printed out at that

11:43:46  2    time when you met with Dr. Painter?

11:43:48  3          A.    It had.

11:43:49  4          Q.    And it had not been emailed to

11:43:52  5    Dr. Dunn at that time; is that correct?

11:43:54  6          A.    No, it was not emailed.

11:43:56  7          Q.    My question is why not.

11:43:59  8                MR. CALLAHAN:  Objection.  You can

11:44:00  9    answer.

11:44:07 10                THE WITNESS:  I thought it was more

11:44:09 11    professional to deliver it to her and that was my

11:44:13 12    plan the next time I saw her.  But since

11:44:16 13    Dr. Painter was on his way to see her that day, I

11:44:22 14    gave it to him.

11:44:33 15    BY MR. MATTHEWS:

11:44:33 16          Q.    What has been your income for

11:44:36 17    2024?

11:44:40 18                MR. CALLAHAN:  Objection.  You can

11:44:42 19    answer.

11:44:45 20                THE WITNESS:  I think that's public

11:44:46 21    information.  I have an annual income on the

11:44:55 22    university side of approximately $300,000 a year,

11:44:59 23    and I have a separate income from Wright State

11:45:03 24    Physicians because it is our practice plan.  I

11:45:07 25    don't have numbers for that off the top of my

56

11:45:09 1  head.

11:45:10 2  BY MR. MATTHEWS:

11:45:10 3       Q.   What's the range?

11:45:12 4            MR. CALLAHAN:  Objection.  You can

11:45:13 5  answer.

11:45:18 6            THE WITNESS:  The range is probably

11:45:24 7  100,000 to $200,000 approximately.  That's my

11:45:33 8  clinical income.

11:45:34 9  BY MR. MATTHEWS:

11:45:34 10       Q.   So for 2024 you received

11:45:36 11 approximately $300,000 as an employee of Wright

11:45:43 12 State University?  Is that your testimony?

11:45:44 13           MR. CALLAHAN:  Objection.  You can

11:45:45 14 answer.

11:45:45 15           THE WITNESS:  Approximately.

11:45:46 16 BY MR. MATTHEWS:

11:45:46 17       Q.   And you received approximately

11:45:49 18 between $100,000 and $200,000 as an employee of

11:45:54 19 Wright State Physicians?

11:45:56 20           MR. CALLAHAN:  Objection.  You can

11:45:57 21 answer.

11:46:00 22           THE WITNESS:  Calendar year 2024 I

11:46:03 23 don't have specific numbers but I gave you my best

11:46:07 24 guess as a range.

11:46:08 25 BY MR. MATTHEWS:

57

```
11:46:08   1        Q.   I understand.  I appreciate that.
11:46:09   2   Okay.  And do you receive any other -- have you
11:46:12   3   received any other income in 2024 other than
11:46:17   4   those two that you've just testified to?
11:46:19   5              MR. CALLAHAN:  Objection.  I don't
11:46:22   6   know how this is really calculated to lead to
11:46:25   7   discoverable information regarding Dr. Elman's
11:46:29   8   claims.
11:46:30   9              MR. MATTHEWS:  Objection noted.  You
11:46:31  10   may answer the question.
11:46:32  11              MR. CALLAHAN:  Objection.  You can
11:46:33  12   answer.
11:46:39  13              THE WITNESS:  I think I've received a
11:46:43  14   speaker's fee for a presentation that I gave.
11:46:47  15   BY MR. MATTHEWS:
11:46:48  16        Q.   Where was that?
11:46:49  17        A.   Michigan.
11:46:51  18        Q.   How much was the speaker fee
11:46:54  19   approximately?
11:46:56  20        A.   $500.
11:46:58  21        Q.   Any other income in 2024?
11:47:01  22              MR. CALLAHAN:  Objection.  You can
11:47:02  23   answer.
11:47:03  24              THE WITNESS:  I can't recall any
11:47:04  25   other income in 2024.
```

58

11:47:07  1  BY MR. MATTHEWS:

11:47:07  2           Q.    Okay.

11:48:40  3                 (Thereupon, Plaintiff's Exhibit F:

11:48:40  4  Declaration of Julie P. Gentile, M.D., was marked

11:48:40  5  for purposes of identification.)

11:48:40  6  BY MR. MATTHEWS:

11:48:41  7           Q.    Handing you what I've labeled as

11:48:44  8  Exhibit F, do you recognize that document?

11:49:21  9           A.    I recognize the document.

11:49:23 10           Q.    Is that your signature on that

11:49:29 11  declaration?

11:49:30 12           A.    It is.

11:49:30 13           Q.    Is all the information on there

11:49:33 14  true and correct?

11:49:36 15                 MR. CALLAHAN:  Objection.  You can

11:49:37 16  answer.

11:49:41 17                 THE WITNESS:  Yes.

11:50:06 18                 MR. MATTHEWS:  Let's take about a

11:50:07 19  ten-minute break.

11:50:08 20                 MR. CALLAHAN:  Sure.

11:50:09 21                 (Pause in proceedings.)

11:58:21 22                 MR. MATTHEWS:  Let's get back on the

11:58:22 23  record.  I have no further questions.

11:58:28 24                 MR. CALLAHAN:  Okay.  No further

11:58:29 25  questions?

59

11:58:29  1                    MR. MATTHEWS:  Correct.

11:58:30  2                    MR. CALLAHAN:  All right.  She'll

11:58:33  3    read.  We'll order.

        4                    (Thereupon, the deposition concluded

        5    at 11:58 a.m.)

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

60

1      I, JULIE PATRICE GENTILE, M.D., do hereby

2  certify that the foregoing is a true and accurate

3  transcription of my testimony.

4

5

6      Signature: _____

7

8      Date: _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1 PLEASE USE THIS ERRATA SHEET TO MAKE ANY AND ALL

2 CORRECTIONS BY LISTING THE PAGE NUMBER, LINE

3 NUMBER AND THE PROPOSED CHANGE.  PLEASE DO NOT

4 MARK ON THE TRANSCRIPT.  UPON COMPLETION, PLEASE

5 SIGN AND DATE AT THE BOTTOM.  THANK YOU.

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 Signature: _____    Date: _____

62

1  STATE OF OHIO    )

2  COUNTY OF MIAMI )       SS: CERTIFICATE

3          I, Angela R. Dilts, a Notary Public within

4  and for the State of Ohio, duly commissioned and

5  qualified,

6          DO HEREBY CERTIFY that the above-named,

7  JULIE PATRICE GENTILE, M.D., was by me first duly

8  sworn to testify the truth, the whole truth and

9  nothing but the truth; that said testimony was

10 reduced to writing by me stenographically in the

11 presence of the witness and thereafter reduced to

12 typewriting.

13         I FURTHER CERTIFY that I am not a relative

14 or attorney of either party nor in any manner

15 interested in the event of this action; I am not

16 under a contract as defined in Civil Rule 28(D).

17         IN WITNESS WHEREOF, I have hereunto set my

18 hand and seal of office at Troy, Ohio, on

19 this 19th day of December 2024.

20

21                         _/s/ Angela R. Dilts_____
                           ANGELA R. DILTS
22                         NOTARY PUBLIC, STATE OF OHIO
                           My commission expires 8-9-2026
23

24

25



PLAINTIFF'S
EXHIBIT

A

12-5-24



School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. • Dayton, OH 45408-1461
Tel 937.223.8840 • Fax 937.223.0759
med.wright.edu/psych

November 15, 2016

Dean Dunn:

Below please find notes from my meetings with Dr. Elman. If you have questions please feel free to contact me for additional information.

11/15: Chair Site visit at Access Ohio Mental Health Clinic to tour facility and become acquainted with the statewide Telepsychiatry Program for Intellectual Disability. Made comments in the presence of Access Ohio team members that he was shocked that we did not have plans in place for "a patient who appears on the web cam with a gun pointed to his head;" he gave feedback that we needed to immediately institute a plan to respond to such a situation. When he met Dr. Johnson (CEO, Access Ohio, who is of Indian descent), Dr. Elman cited pieces of literature from Iraq regarding addiction psychiatry, and when Dr. Johnson asked if his ethnic origin was Iraqi, Dr. Elman was visibly irritated and replied that he was from Russia. Dr. Johnson then said "I am sorry if I upset you; you cited literature from Iraq so that's why I inquired. I completed my studies in India." Dr. Elman replied, "I can see that." Dr. Elman asked why I had so many grants for "Infectious Disease" (after 5 months in the department he was unaware of the term ID for Intellectual Disability) and after seeing an actual patient appointment, he stated that patients with "mental retardation" do not have the capacity to experience grief and loss. Explained to Dr. Elman that my grants were patients with "Intellectual Disability" (not infectious disease), and had to remind him several times the term mental retardation is no longer acceptable and is pejorative to many.

11/15: Dr. Elman decided to spend $30K annually for 'assistant training directors' although we already have multiple core faculty in place for this role. He did not consult with training director to determine need or with director of operations to secure/establish the funding. He attached $7500 stipends to each of the four positions, even after I explained to him the implication of 'stipends' on the campus; it took multiple hour-long meetings through June 2016 with the help of Dr. Welton to eliminate the stipends for these positions and utilize existing faculty.

03/01/16 Faculty Annual Review: Dr. Elman questioned why I give so many presentations instead of conducting research. He also questioned why I write so many book chapters instead of conducting research; I explained my grant work and the educational/clinical objectives for each funder who supports my base salary. Dr. Elman appeared to have no knowledge of any of my work and had not reviewed my submitted annual summary. He also spoke poorly of the department, stating that the educational programming did not meet his expectations.

03/22/16 Meeting with Dr. Elman; he stated he was unclear as to the purpose of the annual faculty reviews and asked me if he could delegate this task. He stated that writing the paragraph about each faculty was extremely time consuming. For 2017, he plans to revise system so that

DEFENDANT 001057



School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. • Dayton, OH 45408-1461
Tel 937.223.8840 • Fax 937.223.0758
med.wright.edu/psych

faculty fills out a form for him to eliminate this from his task list. This was the first year that only the faculty located within the department received invitations to attend faculty reviews with the Chair (no community based faculty). I asked him to reach out to the faculty in the community as a gesture to build relationships with those volunteering their time to department. He made a comment that he wants to hire faculty from other countries because 'Americans have a poor work ethic.' I asked him if he planned reach out to the graduating residents to keep civilians connected to the department; he didn't appear to know any of their names or military status, nor did he appear able to identify the Chief Residents. I specifically told him that MM (civilian) was very interested in academic psychiatry, and she was our Chief Resident; he did not reach out to her. MM was pursued by OSU and now works there full time. I told him I had grave concerns about the lack of visa status of the faculty applicants he was inviting to interview; he stated that he did not share my concern.

06/05/16: Prior to opening comments at graduation, I asked Dr. Elman if he had prepared remarks and offered to review them if he wished. He declined my offer. Summary of Dr. Elman's graduation opening remarks: 1) as you start your practice of medicine, "lower your expectations;" 2) "awards mean nothing" (just prior to our awards presentations); 3) story of obese male seals killing females during copulation. Many faculty and family members reported that they were offended by these remarks. When I spoke to Dr. Elman about this, he stated he was referring to Darwin's theory and everyone in attendance should have been familiar with this concept. He refused to acknowledge that some attendees were offended.

06/07/16: Grand Rounds: Topic Pornography; Dr. Elman made comments to the attendees including that Dr. Cowan planned to start a clinic for "Sexual Dysfunction" and "Gender Dysphoria" (she, in fact, had suggested starting a mental health clinic in Dayton for the LGBT community); I made attempts to explain that addressing the LGBTQ community with the other terms was pejorative. Dr. Elman also publicly recommended all residents view pornography so they are better able to interpret and make interventions with patients who use porn.

06/07/16: Meeting with Dr. Elman; explained to him that several of the faculty interviewees he had pursued did not have visas and this was a legal issue that concerned me greatly. He continued to pursue an applicant of Chinese descent with a soon to be expired visa, despite my warnings and grave concerns that this would be a problem for the BSOM, HR, and General Counsel. He continued his pursuit of this hire, and I finally told him that I was going to clearly document my concerns and if he moved forward on this hire, I would have it documented that I spoke with him on multiple occasions about this, and I did not stand by him on this decision, nor would I be connected to it. At the lunch meeting on interview day with the candidate, Dr. Elman offered to write him a letter of support for citizenship, and stated that he knew "the system" very well and could facilitate this pursuit. Dr. Elman persisted and suggested that our department pursue a contractual agreement with the applicant's university in NY so he could begin work with our department while still in NY. I reminded him there had been visa issues on

DEFENDANT 001058



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd • Dayton, OH 45408-1461
Tel 937 223.6040 • Fax 937 223 0756
med.wright-edu/psych

the campus recently and it would put our department at risk, but he did not share my concerns. He also asked me to design a strategic plan for the department. He told me he had googled the search words "strategic plan" to give him some direction. He used some screen shots of the google results for "strategic plan" in one of his presentations to the faculty on this topic.

06/17/16: Orientation day for the first year resident class; Dr. Elman was 15 minutes late to his 30 minute "Chair Welcome." During introductions, an R1 stated he had a specific research interest; Dr. Elman responded to the R1 that it wasn't a "real" research question, it was evident that the outcomes had already been clearly established in the literature; I interrupted Dr. Elman because the R1 was clearly embarrassed and offended; I assured the R1 he was to be commended for having done additional reading and for sharing this academic curiosity with the group; Dr. Elman followed my comments by stating aloud "I made comments that were offensive and then Dr. Gentile interrupted me and made the resident feel reassured."

06/21/16: A faculty member reported to me she had emailed Dr. Elman twice and also stopped by his office on one occasion to introduce herself; he told her he was busy unpacking and never responded to her emails. In particular, in one of her emails, she expressed interest in a posted position (for Director of Medical Student MH Services) and received no response. Two other faculty shared with me that they planned to leave the department if the current direction continued and if emphasis of psychotherapy continued to be devalued by the Chair.

06/21/16: Discussed with Dr. Elman the importance of closure to the Dr. Weston interview for the Directorship of the Child Psychiatry Program; Dr. Elman repeatedly stated it was not necessary to give her feedback from her 06/16/16 interview for the Directorship of the CAP Division. Encouraged him many times to deliver the information that she would not be named the Director; given that she is an internal candidate and has an office three doors from him, this is not optional. He proposed he would name her "Chief Academic Officer" of the department and give her a stipend as a 'consolation.' After multiple meetings of repeating the same request, he finally met with her on 08/04/16. He again asked me to design a strategic plan for the department again because he had not done this before; he never followed up and asked to review this document.

07/27/16: Dr. Elman stated we need to discontinue the focus on psychotherapy in our department and suggested that we close or modify the resident clinic. He stated psychotherapy was "irrelevant" and "not based in reality;" stated all of the educational and clinical programs in the department are 'lacking' and 'sub par.' I reminded him that completion of psychotherapy hours was a requirement of our accrediting organization. Asked him if he planned to do any teaching in the department and he stated he did not have time.

08/09/16: Dr. Elman stated psychotherapy is irrelevant and our didactics are lacking; literature from department is "embarrassing" and publications from our department are not in 'real

DEFENDANT 001059



School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. • Dayton, OH 45408-1461
Tel 937.223.8840 • Fax 937.223.0759
med.wright.edu/psych

journals.' I asked if he would meet individually with the candidate applicants to our program beginning in the fall; he stated he did not feel this was necessary and it was too time consuming. I mentioned that he devalues our didactics, yet he is not involved in any teaching in the department. He stated he was too busy and did not have time as he was building an addiction clinic. He first spoke of an addiction clinic in August 2015.

08/12/16: Strategic Planning Steering Committee Meeting; Dr. Elman was to deliver his plan to the faculty at this meeting. I offered to review/discuss his slides prior to the meeting, but he declined my offer. The meeting was well attended; the presentation was not well received; one called it "an MBA course" and multiple faculty interrupted the presentation after an hour and asked to take a break. He received some harsh criticism from several faculty. His follow up meeting to finalize the strategic plan is scheduled for 12/13/16, approximately 18 months after the start of his tenure.

08/16/16: Dr. Elman described plans to start an addiction clinic since August 2015, but there has been no progress. I offered to take the lead and start an addiction clinic on my own and asked him to delegate this to me; Dr. Elman immediately declined, stating collaborating with existing community resources would be 'sub-average' and 'amateur;' he wants a clinic within our department and his/WSU name on it; wants to make it profitable and a 'money maker;' does not want to engage with other agencies or pursue collaborative relationships. I pointed out that our department has no vehicle to bill Medicare or Medicaid and we would have to collaborate (at least initially) with an existing community partner, and he refused.

08/23/16: Returned from leave; Dr. Elman was very upset due to the Dr. Hardy incident (wherein she asked that Dr. Elman not be involved in the introduction of a guest speaker). Dr. Elman also stated he thinks Dr. Kay wants his job back, and had publicly embarrassed him at graduation; very angry with people who "go to the Deans office" and report on him. I reminded him that Dr. Kay's attempt to get him to curtail his comments was not public until Dr. Elman announced it to the crowd. Told Dr. Elman that several CAP faculty were concerned that there was no Director of the CAP Division; he asked for names and details of what was said about him. He asked which faculty come to me with comments and concerns and asked me to report names and details to him. Stated he disagreed with my decision to approve a flyer/invitation for Dr. Gabbard visit; stated I should call him before making decisions even when he is traveling. He stated that I can act as a "liaison" between faculty and Dr. Elman, but I should not make decisions without his input. Stated he was planning to call HR to report all the wrongdoings toward him (character defamation; public embarrassment; Dr. Kay allegedly wanting job the Chair position back). He shared with me he was told by the Dean he had to meet with a "job coach" or "mentor" and was not interested in this; he was very angry that "people went to the Dean about my graduation remarks. I want to know who these people are." He spent the remainder of the meeting trying to figure this out and could not be redirected to other topics.

DEFENDANT 001060



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd • Dayton, OH 45408-1461
Tel 937 223-8840 • Fax 937 223-0756
med.wright.edu/psych

09/06/16: Dr. Elman again stated psychotherapy is irrelevant and "from the 20th century" and should be eliminated from the curriculum. He stated the department is living in the 20th century and not based in reality. This meeting with Dr. Elman was immediately prior to an open faculty meeting, so I strongly persuaded him to avoid making these remarks in this public forum, but he ignored my advice and mentioned both comments publicly in the faculty meeting a few minutes later.

09/21/16: Dr. Elman planned trip to Israel during Glen Gabbard visit (internationally renowned psychotherapy guest lecturer). He told me he had decided that the addiction clinic should be at Kettering Medical Center; later in the same meeting stated, "let's open a clinic somewhere and you can just start seeing patients." Dr. Welton asked that I attend a Premier Health Partners (PHP) meeting with him; Dr. Elman told me to back out and let Dr. Welton go to the PHP meeting alone (without stating a reason). I encouraged Dr. Elman to go to a meeting with Ohio Dept. of Mental Health and Addiction Services since we receive important funding from the department and we had developed a long-term relationship with this state agency. He stated he had other important meetings and preferred not to attend. He changed his mind only after Medical Director Mark Hurst personally invited him to a private 30-minute meeting before the statewide group meeting. Dr. Elman later reported that he was 20 minutes late for this private meeting. I offered to oversee clinical and educational programs in the dept., so he could focus on research, but he stated the Chair needs to know everything that goes on and he could not delegate anything to me. I asked to attend upcoming meetings with Kettering Health Network as I could facilitate a relationship with the Grants and Research Program, but was never invited to any future meetings.

09/22/16: Met with upper level resident; she stated most residents try to avoid interface with Dr. Elman; each time he meets with them, the relationship appears to worsen. Dr. Elman plans resident dinners with the Chair and these were poorly received and poorly attended; she stated residents were still embarrassed by the graduation remarks and continue to discuss that; morale is very low; upset that he has changed many important long standing traditions (annual picnic; holiday party plans; resident skit). She stated he openly degrades psychotherapy; mentioned he thinks our program's emphasis on psychotherapy is outdated and he made these comments to some of the medical student candidates who were here to interview for our program.

09/27/16: Dr. Elman reported to me that he had discussed the alleged public defamation issues to HR and General Counsel and finally the "office of equity." He again asked me if I could write articles on addiction with him; I told him to reach out to R4's who had publication requirements prior to graduation and junior faculty who were in need of publication experience as this would be an opportunity for mentoring and to build relationships within the department. To be best of my knowledge he did not follow up on this suggestion.

DEFENDANT 001061



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place • East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd • Dayton, OH 45408-1461
Tel 937.223.8840 • Fax 937.223.0759
med.wright.edu/psych

09/27/16: I met with an interviewee (medical student candidate for our program) who reported that during Chair welcoming comments, he mentioned negativity regarding psychotherapy, which is our strongest recruiting tool; our chief resident was present in the meeting and confirmed these comments. I assured the interviewee this was a founding principle of our program and would remain in place. (Fourth year medical students reported this information to me during multiple interviews.)

10/03/16: Dr. Elman stated our program needs a consultant from Harvard or Yale; stated he was leaving town for 2 weeks and would need me to set up Skype appointments with him to keep him updated and to seek his advice on any timely issues. I asked him to reconsider having the mandatory meeting for the department; it may be perceived as a suggestion about what residents and faculty can and cannot do regarding reporting procedures, and it potentially continues to shed light on his graduation remarks. He disagreed and planned to move forward with his agenda.

10/26/16: Meeting with Dr. Elman. Discussed 'mandatory departmental meeting' and encouraged him to provide an agenda to faculty and residents. Again stated he wanted to start addiction clinic but was unsure how to proceed. Dr. Elman presented Grand Rounds on this date and the attendance was very low.

11/01/16: Meeting with Dr. Elman; he stated no one ever told him what his job consisted of and what his role was in the department. He asked me to explain the job description of a Department Chair. He asked if I could serve as the Director of the Child/Adolescent Psychiatry program. Told him I was not qualified and would not be a credible leader for the fellowship as I am an adult psychiatrist; this also does not follow AACAP recommendations. He asked what I was contributing to the department and asked me to list my activities for him. He asked me to define both his job description and mine.

Since May 2016, multiple faculty in our department have approached me to meet regarding administrative issues, contract negotiations, faculty appointments, complicated clinical issues, attending meetings with an Assistant/Associate Deans present, and for recruitment activities. It is common for them to ask that I not involve Dr. Elman, particularly if the issue pertains to psychotherapy, clinical, educational or fiscal operations.

Respectfully submitted,

Julie P. Gentile MD
Professor and Deputy Chair

DEFENDANT 001062



**PLAINTIFF'S
EXHIBIT**

D

12-5-24



Boonshoft
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place ▪ East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. ▪ Dayton, OH 45408-1461
Tel 937.223.9840 ▪ Fax 937.223.0756
med.wright.edu/psych

November 15, 2016

Dean Dunn:

Below please find notes from my meetings with Dr. Elman. If you have questions please feel free to contact me for additional information.

11/15: Chair Site visit at Access Ohio Mental Health Clinic to tour facility and become acquainted with the statewide Telepsychiatry Program for Intellectual Disability. Made comments in the presence of Access Ohio team members that he was shocked that we did not have plans in place for "a patient who appears on the web cam with a gun pointed to his head;" he gave feedback that we needed to immediately institute a plan to respond to such a situation. When he met Dr. Johnson (CEO, Access Ohio, who is of Indian descent), Dr. Elman cited pieces of literature from Iraq regarding addiction psychiatry, and when Dr. Johnson asked if his ethnic origin was Iraqi, Dr. Elman was visibly irritated and replied that he was from Russia. Dr. Johnson then said "I am sorry if I upset you; you cited literature from Iraq so that's why I inquired. I completed my studies in India." Dr. Elman replied, "I can _see_ that." Dr. Elman asked why I had so many grants for "Infectious Disease" (after 5 months in the department he was unaware of the term ID for Intellectual Disability) and after seeing an actual patient appointment, he stated that patients with "mental retardation" do not have the capacity to experience grief and loss. Explained to Dr. Elman that my grants were patients with "Intellectual Disability" (not infectious disease), and had to remind him several times the term mental retardation is no longer acceptable and is pejorative to many.

11/15: Dr. Elman decided to spend $30K annually for 'assistant training directors' although we already have multiple core faculty in place for this role. He did not consult with training director to determine need or with director of operations to secure/establish the funding. He attached $7500 stipends to each of the four positions, even after I explained to him the implication of 'stipends' on the campus; it took multiple hour-long meetings through June 2016 with the help of Dr. Welton to eliminate the stipends for these positions and utilize existing faculty.

03/01/16 Faculty Annual Review: Dr. Elman questioned why I give so many presentations instead of conducting research. He also questioned why I write so many book chapters instead of conducting research; I explained my grant work and the educational/clinical objectives for each funder who supports my base salary. Dr. Elman appeared to have no knowledge of any of my work and had not reviewed my submitted annual summary. He also spoke poorly of the department, stating that the educational programming did not meet his expectations.

03/22/16 Meeting with Dr. Elman; he stated he was unclear as to the purpose of the annual faculty reviews and asked me if he could delegate this task. He stated that writing the paragraph about each faculty was extremely time consuming. For 2017, he plans to revise system so that faculty fills out a form for him to eliminate this from his task list. This was the first year that only the faculty located within the department received invitations to attend faculty reviews with the Chair (no community based faculty). I asked him to reach out to the faculty in the community as a gesture to build relationships with those volunteering their time to department. He made a comment that he wants to hire faculty from other countries because 'Americans have a poor work ethic.' I asked him if he planned reach out to the graduating residents to keep civilians connected to the department; he didn't appear to know any of their names or military status, nor did he appear able to identify the Chief Residents. I specifically

DEFENDANT 000158



**Booushoft**
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place ▫ East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd, ▫ Dayton, OH 45408-1461
Tel 937.223.8840 ▫ Fax 937.223.0758
med.wright.edu/psych

told him that MM (civilian) was very interested in academic psychiatry, and she was our Chief Resident; he did not reach out to her. MM was pursued by OSU and now works there full time. I told him I had grave concerns about the lack of visa status of the faculty applicants he was inviting to interview; he stated that he did not share my concern.

06/05/16: Prior to opening comments at graduation, I asked Dr. Elman if he had prepared remarks and offered to review them if he wished. He declined my offer. Summary of Dr. Elman's graduation opening remarks: 1) as you start your practice of medicine, "lower your expectations;" 2) "awards mean nothing" (just prior to our awards presentations; 3) story of obese male seals killing females during copulation. Many faculty and family members reported that they were offended by these remarks. When I spoke to Dr. Elman about this, he stated he was referring to Darwin's theory and everyone in attendance should have been familiar with this concept. He refused to acknowledge that some attendees were offended.

06/07/16: Grand Rounds: Topic Pornography; Dr. Elman made comments to the attendees including that Dr. Cowan planned to start a clinic for "Sexual Dysfunction" and "Gender Dysphoria" (she, in fact, had suggested starting a mental health clinic in Dayton for the LGBT community); I made attempts to explain that addressing the LGBTQ community with the other terms was pejorative. Dr. Elman also publicly recommended all residents view pornography so they are better able to interpret and make interventions with patients who use porn.

06/07/16: Meeting with Dr. Elman; explained to him that several of the faculty interviewees he had pursued did not have visas and this was a legal issue that concerned me greatly. He continued to pursue an applicant of Chinese descent with a soon to be expired visa, despite my warnings and grave concerns that this would be a problem for the BSOM, HR, and General Counsel. He continued his pursuit of this hire, and I finally told him that I was going to clearly document my concerns and if he moved forward on this hire, I would have it documented that I spoke with him on multiple occasions about this, and I did not stand by him on this decision, nor would I be connected to this hire. At the lunch meeting on interview day with the candidate, Dr. Elman offered to write him a letter of support for citizenship, and stated that he knew "the system" very well and could facilitate this pursuit. Dr. Elman persisted and suggested that our department pursue a contractual agreement with the applicant's university in NY so he could begin work with our department while still in NY. I reminded him there had been visa issues on the campus recently and it would put our department at risk, but he did not share my concerns. He also asked me to design a strategic plan for the department. He told me he had googled the search words "strategic plan" to give him some direction. He used some screen shots of the google results for "strategic plan" in one of his presentations to the faculty on this topic.

06/17/16: Orientation day for the first year resident class; Dr. Elman was 15 minutes late to his 30 minute "Chair Welcome." During introductions, an R1 stated he had a specific research interest; Dr. Elman responded to the R1 that it wasn't a "real" research question, it was evident that the outcomes had already been clearly established in the literature; I interrupted Dr. Elman because the R1 was clearly embarrassed and offended; I assured the R1 he was to be commended for having done additional reading and for sharing this academic curiosity with the group; Dr. Elman followed my comments by stating aloud "I made comments that were offensive and then Dr. Gentile interrupted me and made the resident feel reassured."

06/21/16: A faculty member reported to me she had emailed Dr. Elman twice and also stopped by his office on one occasion to introduce herself; he told her he was busy unpacking and never responded to her emails. In particular, in one of her emails, she expressed interest in a posted

DEFENDANT 000159



**Boonshoft**
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place ▪ East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. ▪ Dayton, OH 45408-1461
Tel 937.223.5840 ▫ Fax 937.223.0758
med.wright.edu/psych

position (for Director of Medical Student MH Services) and received no response.  Two other faculty shared with me that they planned to leave the department if the current direction continued and if emphasis of psychotherapy continued to be devalued by the Chair.

06/21/16: Discussed with Dr. Elman the importance of closure to the Dr. Weston interview for the Directorship of the Child Psychiatry Program; Dr. Elman repeatedly stated it was not necessary to give her feedback from her 06/16/16 interview for the Directorship of the CAP Division. Encouraged him many times to deliver the information that she would not be named the Director; given that she is an internal candidate and has an office two doors from him, this is not optional. He proposed he would name her "Chief Academic Officer" of the department and give her a stipend as a 'consolation.' After multiple meetings of repeating the same request, he finally met with her on 08/04/16. He again asked me to design a strategic plan for the department again because he had not done this before; he never followed up and asked to review this document.

07/27/16: Dr. Elman stated we need to discontinue the focus on psychotherapy in our department and suggested that we close or modify the resident clinic. He stated psychotherapy was "irrelevant" and "not based in reality;" stated all of the educational and clinical programs in the department are 'lacking' and 'sub par.' I reminded him that completion of psychotherapy hours was a requirement of our accrediting organization. Asked him if he planned to do any teaching in the department and he stated he did not have time.

08/09/16: Dr. Elman stated psychotherapy is irrelevant and our didactics are lacking; literature from department is "embarrassing" and publications from our department are not in 'real journals.' I asked if he would meet individually with the candidate applicants to our program beginning in the fall; he stated he did not feel this was necessary and it was too time consuming. I mentioned that he devalues our didactics, yet he is not involved in any teaching in the department. He stated he was too busy and did not have time as he was building an addiction clinic. He first spoke of an addiction clinic in August 2015.

08/12/16: Strategic Planning Steering Committee Meeting; Dr. Elman was to deliver his plan to the faculty at this meeting. I offered to review/discuss his slides prior to the meeting, but he declined my offer. The meeting was well attended; the presentation was not well received; one called it "an MBA course" and multiple faculty interrupted the presentation after an hour and asked to take a break. He received some harsh criticism from several faculty. His follow up meeting to finalize the strategic plan is scheduled for 12/13/16, approximately 18 months after the start of his tenure.

08/16/16: Dr. Elman described plans to start an addiction clinic since August 2015, but there has been no progress. I offered to take the lead and start an addiction clinic on my own and asked him to delegate this to me; Dr. Elman immediately declined, stating collaborating with existing community resources would be 'sub-average' and 'amateur;' he wants a clinic within our department and his/WSU name on it; wants to make it profitable and a 'money maker;' does not want to engage with other agencies or pursue collaborative relationships. I pointed out that our department has no vehicle to bill Medicare or Medicaid and we would have to collaborate (at least initially) with an existing community partner, and he refused.

08/23/16: Returned from leave; Dr. Elman was very upset due to the Dr. Hardy incident (wherein she asked that Dr. Elman not be involved in the introduction of a guest speaker). Dr. Elman also stated he thinks Dr. Kay wants his job back, and had publicly embarrassed him at

DEFENDANT 000160



Boonshoft
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place ▪ East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. ▪ Dayton, OH 45408-1461
Tel 937.223.8840 ▪ Fax 937.223.0758
med.wright.edu/psych

graduation; very angry with people who "go to the Deans office" and report on him. I reminded him that Dr. Kay's attempt to get him to curtail his comments was not public until Dr. Elman announced it to the crowd. Told Dr. Elman that several CAP faculty were concerned that there was no Director of the CAP Division; he asked for names and details of what was said about him. He asked which faculty come to me with comments and concerns and asked me to report names and details to him. Stated he disagreed with my decision to approve a flyer/invitation for Dr. Gabbard visit; stated I should call him before making decisions even when he is traveling. He stated that I can act as a "liaison" between faculty and Dr. Elman, but I should not make decisions without his input. Stated he was planning to call HR to report all the wrongdoings toward him (character defamation; public embarrassment; Dr. Kay allegedly wanting job the Chair position back). He shared with me he was told by the Dean he had to meet with a "job coach" or "mentor" and was not interested in this; he was very angry that "people went to the Dean about my graduation remarks. I want to know who these people are." He spent the remainder of the meeting trying to figure this out and could not be redirected to other topics.

09/06/16: Dr. Elman again stated psychotherapy is irrelevant and "from the 20ᵗʰ century" and should be eliminated from the curriculum. He stated the department is living in the 20ᵗʰ century and not based in reality. This meeting with Dr. Elman was immediately prior to an open faculty meeting, so I strongly persuaded him to avoid making these remarks in this public forum, but he ignored my advice and mentioned both comments publicly in the faculty meeting a few minutes later.

09/21/16: Dr. Elman planned trip to Israel during Glen Gabbard visit (internationally renowned psychotherapy guest lecturer). He told me he had decided that the addiction clinic should be at Kettering Medical Center; later in the same meeting stated, "let's open a clinic somewhere and you can just start seeing patients." Dr. Welton asked that I attend a Premier Health Partners (PHP) meeting with him; Dr. Elman told me to back out and let Dr. Welton go to the PHP meeting alone (without stating a reason). I encouraged Dr. Elman to go to a meeting with Ohio Dept. of Mental Health and Addiction Services since we receive important funding from the department and we had developed a long-term relationship with this state agency. He stated he had other important meetings and preferred not to attend. He changed his mind only after Medical Director Mark Hurst personally invited him to a private 30-minute meeting before the statewide group meeting. Dr. Elman later reported that he was 20 minutes late for this private meeting. I offered to oversee clinical and educational programs in the dept., so he could focus on research, but he stated the Chair needs to know everything that goes on and he could not delegate anything to me. I asked to attend upcoming meetings with Kettering Health Network as I could facilitate a relationship with the Grants and Research Program, but was never invited to any future meetings.

09/22/16: Met with upper level resident; she stated most residents try to avoid interface with Dr. Elman; each time he meets with them, the relationship appears to worsen. Dr. Elman plans resident dinners with the Chair and these were poorly received and poorly attended; she stated residents were still embarrassed by the graduation remarks and continue to discuss that; morale is very low; upset that he has changed many important long standing traditions (annual picnic; holiday party plans; resident skit). She stated he openly degrades psychotherapy; mentioned he thinks our program's emphasis on psychotherapy is outdated and he made these comments to some of the medical student candidates who were here to interview for our program.

DEFENDANT 000161



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Psychiatry
Elizabeth Place ▪ East Medical Plaza, First Floor
627 S. Edwin C. Moses Blvd. ▪ Dayton, OH 45408-1461
Tel 937.223.8840 ▪ Fax 937.223.0758
med.wright.edu/psych

09/27/16: Dr. Elman reported to me that he had discussed the alleged public defamation issues to HR and General Counsel and finally the "office of equity." He again asked me if I could write articles on addiction with him; I told him to reach out to R4's who had publication requirements prior to graduation and junior faculty who were in need of publication experience as this would be an opportunity for mentoring and to build relationships within the department. To be best of my knowledge he did not follow up on this suggestion.

09/27/16: I met with an interviewee (medical student candidate for our program) who reported that during Chair welcoming comments, he mentioned negativity regarding psychotherapy, which is our strongest recruiting tool; our chief resident was present in the meeting and confirmed these comments. I assured the interviewee this was a founding principle of our program and would remain in place. (Fourth year medical students reported this information to me during multiple interviews.)

10/03/16: Dr. Elman stated our program needs a consultant from Harvard or Yale; stated he was leaving town for 2 weeks and would need me to set up Skype appointments with him to keep him updated and to seek his advice on any timely issues. I asked him to reconsider having the mandatory meeting for the department; it may be perceived as a suggestion about what residents and faculty can and cannot do regarding reporting procedures, and it potentially continues to shed light on his graduation remarks. He disagreed and planned to move forward with his agenda.

10/26/16: Meeting with Dr. Elman. Discussed 'mandatory departmental meeting' and encouraged him to provide an agenda to faculty and residents. Again stated he wanted to start addiction clinic but was unsure how to proceed. Dr. Elman presented Grand Rounds on this date and the attendance was very low.

11/01/16: Meeting with Dr. Elman; he stated no one ever told him what his job consisted of and what his role was in the department. He asked me to explain the job description of a Department Chair. He asked if I could serve as the Director of the Child/Adolescent Psychiatry program. Told him I was not qualified and would not be a credible leader for the fellowship as I am an adult psychiatrist; this also does not follow AACAP recommendations. He asked what I was contributing to the department and asked me to list my activities for him. He asked me to define both his job description and mine.

Since May 2016, multiple faculty in our department have approached me to meet regarding administrative issues, contract negotiations, faculty appointments, complicated clinical issues, attending meetings with an Assistant/Associate Deans present, and for recruitment activities. It is common for them to ask that I not involve Dr. Elman, particularly if the issue pertains to psychotherapy, clinical, educational or fiscal operations.

Respectfully submitted,

Julie P. Gentile MD
Professor and Deputy Chair
Wright State University Department of Psychiatry

DEFENDANT 000162



PLAINTIFF'S
EXHIBIT
F
12-5-24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **IGOR ELMAN,** | : | |
| **Plaintiff,** | : | **CASE NO. 3:18-cv-00358-WHR-PBS** |
| **v.** | : | **JUDGE WALTER H. RICE** |
| **WRIGHT STATE UNIVERSITY,** | : | **MAGISTRATE JUDGE SILVAIN** |
| **Defendant.** | : | |

## DECLARATION OF JULIE P. GENTILE, M.D.

I, Julie Gentile, affirm that the following statements are true and accurate to the best of my knowledge and belief:

1.      My name is Julie Gentile and I am over eighteen years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am currently employed by Wright State University ("WSU") and my title is Professor and Chair of the Department of Psychiatry ("Department"). I am a Distinguished Fellow of the American Psychiatric Association.

3.      I am acquainted with Dr. Igor Elman, and I have knowledge of his pending litigation against WSU.

4.      I have been Chair of the Department for four and one-half years. In my capacity as Chair, I have access to continuing medical education evaluations that are initiated from engagements held within the Department.

5.      In accordance with Dr. Elman's litigation, I was instructed to search for and retrieve any evaluations pertaining to Dr. Elman and speeches he made during his employment with WSU.

6.      I undertook a search for evaluations in the Department, and to the best of my knowledge, all evaluations pertaining to Dr. Elman in custody and control of the Department were retrieved from his personnel file and provided to the Office of General Counsel. Any internal evaluations of Dr. Elman from the Department were entered into his personnel file; it was Dr. Elman's responsibility to submit any additional educational evaluations that he received to Department staff to enter into his personnel file. Dr. Elman's entire personnel file was photocopied and submitted to the Office of General Counsel.

7.      The Department does not have a retention policy for evaluations. Moreover, to the best of my knowledge, the Department does not have a comprehensive record that would reflect when Dr. Elman had speaking engagements external to the Department, nor the particulars of any of these speaking engagements.

8.      If Dr. Elman performed any speeches for continuing medical education seminars outside of the Department, I would not have access to those. I also do not have access to evaluations for speeches in general that Dr. Elman may have performed for other Departments, or on his own accord. Each faculty member in the Department manages his or her own schedule.

9.      Dr. Elman did not teach any formal didactic sequences in the Department to the best of my knowledge during his employment with WSU. Likewise, no course evaluations exist that would reflect upon his qualities or faults as an "educator."

10.     I have never destroyed, nor overseen the destruction of any documents related to Dr. Elman. In addition, I have no knowledge, information or belief that anyone else at Wright State has ever done so.

JULIE P. GENTILE, M.D.

2

**PLAINTIFF'S EXHIBIT**
6
12-5-24

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Ohio

| | |
|---|---|
| Igor Elman | ) |
| *Plaintiff* | ) |
| v. | ) |
| Wright State University | ) |
| *Defendant* | ) |

Civil Action No.   3:18cv0358

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      JULIE P. GENTILE, M.D., 2555 University Boulevard, 3640 Colonel Glenn Highway, Dayton, Ohio 45435

*(Name of person to whom this subpoena is directed)*

❒ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Craig T. Matthews & Associates, LPA<br>320 Regency Ridge Drive<br>Centerville, Ohio 45459 | Date and Time:<br>12/05/2024 10:00 am |
|---|---|

The deposition will be recorded by this method:  certified court reporter

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All documents related to Dr. Igor Elman.  Electronically stored information is to be provided in paper form.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: *11-25-2024*

CLERK OF COURT

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiff, Igor Elman
_____ , who issues or requests this subpoena, are:

Craig T. Matthews, Esq., 320 Regency Ridge Dr., Centerville, OH 45459, cmatthews@ctmlaw.com; (937) 434-9393

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 3:18cv0358

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
        (i) is a party or a party's officer; or
        (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
    (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
    (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

    (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

        (i) fails to allow a reasonable time to comply;
        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        (i) disclosing a trade secret or other confidential research, development, or commercial information; or
        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
    (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        (i) expressly make the claim; and
        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022



### *Curriculum Vitae*

Julie P. Gentile, M.D., M.B.A., Professor and Chair, Psychiatry
2555 University Boulevard, Suite 100
Campus South
Dayton, Ohio 45435
Phone 937-775-7792
e-mail < julie.gentile@wright.edu>

## EDUCATION

| | |
|---|---|
| 1987 – 1992 | Wright State University, Dayton, Ohio<br>Psychology/Premedical Studies |
| 1992 – 1996 | Wright State University Boonshoft School of Medicine, Dayton, Ohio<br>Medicine |
| 2020 – 2021 | Missouri State University Business School, Springfield, Missouri |

## POSTGRADUATE EDUCATION

| | |
|---|---|
| 1996 – 2000 | Internship and Psychiatry Residency<br>Wright State University Boonshoft School of Medicine<br>Department of Psychiatry |

## ACADEMIC EXPERIENCE

| Institution | Position | Date |
|---|---|---|
| Wright State University, Dayton, Ohio | Chair | 2017-present |
| Wright State University, Dayton, Ohio | Interim Chair | 2016 |
| Wright State University, Dayton, Ohio | Full Professor | 2014-present |
| Wright State University, Dayton, Ohio | Director, Division of Intellectual Disability Psychiatry | 2013-present |
| Wright State University, Dayton, Ohio | Associate Professor | 2008-2014 |
| Wright State University, Dayton, Ohio | Director, Medical Student Mental Health Services | 2003-2013 |
| Wright State University, Dayton, Ohio | Assistant Professor | 2003-2008 |

## BOARD CERTIFICATION

Board Certified, American Board of Psychiatry and Neurology, 2001

Board Certified, American Board of Psychiatry and Neurology, 2011

Curriculum Vitae
Julie P. Gentile MD                                                June 2022

Board Certified, American Board of Psychiatry and Neurology, 2021 (expires 12/31/2031)

# MEDICAL LICENSE

Ohio License 35-073216

# PROFESSIONAL EXPERIENCES

| Institution | Position | Dates |
|---|---|---|
| CWRU and NEOMED | ECHO IDD Psychiatry Expert Consultant | 2019-2021 |
| OhioMHAS | Statewide Intellectual Disability Consultant | 2017-present |
| Montgomery County ADMHAS | Chief Clinical Officer | 2017-2022 |
| Wright State University | Project Director/Primary Investigator, Ohio's Telepsychiatry Project For Intellectual Disability | 2012-present |
| New Hope Villa | Medical Director | 2007-2014 |
| TCN Behavioral Healthcare | Attending Psychiatrist | 2005-2011 |
| Ohio Depts. of Mental Health And Developmental Disability | Project Director and Primary Investigator, State of Ohio Coordinating Center of Excellence in Mental Illness/Intellectual Disability | 2003-present |
| Ohio Depts. of Mental Health And Developmental Disability | Professor of Dual Diagnosis Funded professorship supported by state agencies | 2003-present |
| Wright State University | Division Director, Intellectual Disability | 2003-present |
| Consumer Advocacy Model | Medical Director | 2003-2014 |
| Twin Valley Behavioral Health | Attending Physician | 2000-2003 |
| Twin Valley Behavioral Health | Medical Officer | 1998-2000 |
| Grandview Hospital | Medical Officer | 1999-2000 |
| Veterans Administration Medical Center, Dayton, Ohio | Medical Officer | 1998-2000 |

# PROFESSIONAL MEMBERSHIPS

| Association | Status | Dates |
|---|---|---|
| Vice Dean Search Committee BSOM | Chair | 2021 |

Curriculum Vitae
Julie P. Gentile MD                                              June 2022

| | | |
|---|---|---|
| Innovations in Clinical Neuroscience | National Editor, Psychotherapy Column | 2018-present |
| Dean Search Committee BSOM | Committee Member | 2020 |
| Wright State Physicians Inc. | Finance Committee | 2019-present |
| Wright State Dept. of Psychiatry | Residency Training Committee | 2016-present |
| Wright State BSoM | WSP Steering Committee | 2018 |
| Wright State Physicians Inc. | Board of Directors | 2016-present |
| Wright State BSoM | Promotions/Advancement Committee | 2017-2019 |
| Wright State BSoM | Promotions/Advancement, Chair | 2018-2019 |
| Wright State BSoM | Executive Committee | 2017-present |
| WSU Boonshoft SOM | Chair, Nominating Committee | 2016-2017 |
| Ohio Psychiatric Physicians Assn | Chair, Telepsychiatry Committee | 2017-present |
| Ohio Abuse Advisory Committee | Statewide Advisory Board Member | 2015-2016 |
| Ohio Trauma Advisory Committee | Statewide Co-Chair | 2014-present |
| Toward Independence, Inc. | Board of Trustees | 2015-present |
| Menolascino Award Committee | Member, Chair (2014-2015; 2018-present) | 2013-present |
| Wright State University Dean's Advisory Leadership Council | Advisory Board Member | 2014-2018 |
| Wright State University Academy of Medicine | President Membership Chair Awards Chair Board of Trustees | 2014-2015 2011-2013 2009-2011 2006-2018 |
| WSU Boonshoft SOM | Research Committee | 2011-2012 |
| Resident Home Corporation | Board of Trustees | 2011-2014 |
| Montgomery Developmental Center Citizen's Advisory Council | Member | 2010-2017 |
| Positive Culture Institute | Appointed Statewide Leader | 2009-2013 |
| Butler County START Program | Advisory Board Member | 2009-2012 |
| American Psychiatric Association | Distinguished Fellow Fellow Member | 2017-present 2012-2016 2008-present |
| Ohio Psychiatric Physician Association | Member | 2008-present |
| NADD Psychopharmacology Group | National Chair | 2008-present |

Curriculum Vitae
Julie P. Gentile MD                                                        June 2022

| | | |
|---|---|---|
| WSU Department of Psychiatry Promotions Committee | Member | 2005-2012 |
| Innovations in Clinical Neuroscience | Editorial Board Member | 2005-present |
| Ohio Behavioral Pharmacy Management | Advisory Board Member | 2005-2007 |
| Twin Valley Behavioral Healthcare | Medical Staff Executive Committee | 2002-2003 |
| Twin Valley Behavioral Healthcare | Task Force: Management of the Suicidal Patient | 2001-2002 |
| Wright State University/ University of Dayton Collaborative For Service Learning | Member | 2000-2006 |
| Wright State University Dept. of Psychiatry | Psychotherapy Supervision Task Force | 2000 |
| Wright State University Dept. of Psychiatry | Residency Training Committee | 1998-1999 |

## PROFESSIONAL AWARDS

| Title of Award | Granting Association | Date |
|---|---|---|
| America's Best Doctors | America's Best Doctors, Inc. | 2021-2022 |
| America's Best Doctors | America's Best Doctors, Inc. | 2020-2021 |
| Who's Who in America | Who's Who in America, Inc. | 2019-2020 |
| America's Best Doctors | America's Best Doctors, Inc. | 2019-2020 |
| America's Best Doctors | America's Best Doctors, Inc. | 2018-2019 |
| Best Doctors in America | Best Doctors, Inc. | 2018-2019 |
| Best Doctors in America | Best Doctors, Inc. | 2017-2018 |
| Humanitarian Award | United Rehabilitation Services | 2017 |
| Faculty Recognition Award | WSU Dept. of Psychiatry Residents | 2017 |
| American Psychiatric Association | Distinguished Fellow Designation | 2017 |
| Citizen's Award | Dayton Police Department | 2017 |
| Best Doctors in America | Best Doctors, Inc. | 2016-2017 |
| Best Doctors in America | Best Doctors, Inc. | 2015-2016 |
| Best Doctors in America | Best Doctors, Inc. | 2014-2015 |

Curriculum Vitae
Julie P. Gentile MD                                                         June 2022

| Frank J. Menolascino National Award | Nat'l Assoc. for the Dually Diagnosed | 2013 |
|---|---|---|
| Best Doctors in America | Best Doctors, Inc. | 2013-2014 |
| Best Doctors in America | Best Doctors, Inc. | 2012-2013 |
| Best Doctors in America | Best Doctors, Inc. | 2011-2012 |
| Lifetime Career Achievement Award | WSU Department of Psychiatry | 2011 |
| American Psychiatric Association | Fellow | 2010 |
| Top Ten Woman of the Year | Dayton Daily News | 2010 |
| Frank J. Menolascino National Award | American Psychiatric Association | 2010 |
| Golden Apple Teaching Award | WSU Department of Psychiatry | 2010 |
| National Award for Clinical Excellence | Nat'l Assoc. for the Dually Diagnosed | 2009 |
| Director's Award | Mont. County Board of DD | 2008 |
| Hall of Fame for Excellence in DD | Mont. County Board of DD | 2008 |
| AOA Medical Honor Society | Wright State University | 2007 |
| Faculty Recognition Award | WSU Dept. of Psychiatry | 2006 |
| Junior Faculty Award for Excellence in Medical Student Education | WSU Academy of Medicine | 2006 |
| Chair's Recognition Award | WSU Dept. of Psychiatry | 2005 |
| Nancy A. Roeske, M.D. Excellence in Medical Student Education | American Psychiatric Association | 2005 |
| Future Leaders in Psychiatry Award | Emory School of Medicine | 2004 |
| Dr. Allen Outstanding Resident Award | WSU Dept. of Psychiatry | 1999-2000 |

## GRANTS AND CONTRACTS

### Total Awards (2003-present): $11,414,531

Ohio Department of Mental Health and Addiction Services
Principal Investigator: Julie P. Gentile, MD, MBA
Title: Training Series Mental Illness/Intellectual Disability
Direct Costs: $200,000, 2022

Ohio Department of Developmental Disability
Principal Investigator: Julie P. Gentile MD, 2022
Title: Consultant to Director Hauck
Direct Costs: $90,000 (Renewed 2023)

Curriculum Vitae
Julie P. Gentile MD                                                      June 2022

Ohio Department of Developmental Disability
Principal Investigator: Julie P. Gentile MD, 2021
Title: Consultant to Director Davis
Direct Costs: $78,000

Ohio Department of Developmental Disability
Principal Investigator: Julie P. Gentile MD, 2022
Title: Ohio's Telepsychiatry Project for Intellectual Disability
Direct Costs: $250,000 Renewed 2023)

Ohio Department of Developmental Disabilities
Principal Investigator: Julie P. Gentile, M.D., 2022
Title: DODD Training Grant: Dual Diagnosis: Mental Illness/Intellectual Disability
Direct Costs: $90,000 (Renewed 2023)

Ohio Department of Developmental Disabilities
Principal Investigator: Julie P. Gentile, M.D., 2017
Title: Professor of Dual Diagnosis, Mental Illness/Intellectual Disability
Direct Costs: $80,000 (Renewed 2018, 2019, 2020. 2021)

Ohio Department of Developmental Disability
Principal Investigator: Julie P. Gentile MD, 2013
Title: Ohio's Telepsychiatry Project for Intellectual Disability
Direct Costs: $225,000 (renewed 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021)

Montgomery County Board of Developmental Disabilities
Principal Investigator: Julie P. Gentile, MD, 2014
Title: Professor of Dual Diagnosis in Mental Illness/Intellectual Disability
Direct Costs: $34,033 (renewed 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022)

Ohio Dept. Job and Family Services, Dept. of Developmental Disability and Dept. of Mental Health
Principal Investigator: Julie P. Gentile MD, 2012
Title: Ohio's Telepsychiatry Project for Intellectual Disability
Direct Costs: $133,300

Ohio Dept. Job and Family Services, Dept. of Developmental Disability and Dept. of Mental Health Principal
Investigator: Julie P. Gentile MD, 2012
Title: Ohio's Telepsychiatry Project for Intellectual Disability
Direct Costs: $50,000

Ohio Department of Mental Health and Addiction Services
Principal Investigator: Julie P. Gentile, MD, 2011
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $85,500 (renewed 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022)

Ohio Department of Mental Health and Addiction Services
Principal Investigator: Julie P. Gentile, MD, 2010
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $95,000

Ohio Department of Mental Health
Principal Investigator: Julie P. Gentile, MD, 2010
Title: TSIG Funding/Coordinating Center of Excellence in Mental Illness/ Intellectual Disability
Direct Costs: $100,000

Ohio Department of Mental Health

Curriculum Vitae
Julie P. Gentile MD                                                      June 2022

Principal Investigator: Julie P. Gentile, MD, 2009
Title: TSIG Funding/Coordinating Center of Excellence in Mental Illness/ Intellectual Disability
Direct Costs: $50,000

Ohio Department of Mental Health
Principal Investigator: Julie P. Gentile, MD, 2009
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $150,000

Montgomery County Board of Developmental Disabilities
Principal Investigator: Julie P. Gentile, MD, 2008
Title: Professor of Dual Diagnosis in Mental Illness/Intellectual Disability
Direct Costs: $32,445 (renewed 2009, 2010, 2011, 2012, 2013)

Ohio Department of Mental Health
Principal Investigator: Julie P. Gentile, MD, 2007
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $80,000 (renewed 2008)

Montgomery County Board of Developmental Disabilities
Principal Investigator: Julie P. Gentile, M.D., 2006
Title: Professor of Dual Diagnosis in Mental Illness/Intellectual Disability
Direct Costs: $31,500 (renewed 2007)

Ohio Department of Mental Health
Principal Investigator: Julie P. Gentile, M.D., 2004
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $75,000 (renewed 2005, 2006)

Ohio Department of Mental Retardation and Developmental Disabilities
Principal Investigator: Julie P. Gentile, M.D., 2004
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $75,000 (renewed 2005, 2006, 2007, 2008)

Ohio Developmental Disabilities Council
Principal Investigator: Julie P. Gentile, M.D., 2004
Title: Coordinating Center of Excellence in Mental Illness/Intellectual Disability
Direct Costs: $75,000 (renewed 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016)

Ohio Department of Mental Health
Principal Investigators: Ann Morrison, M.D., 2003
Co-Investigator: Julie P. Gentile, M.D.
Title: Community Psychiatry Residency Training
Direct Costs: $30,000 (renewed 2004, 2005, 2006, 2007, 2008)

Ohio Department of Developmental Disabilities
Principal Investigator: Julie P. Gentile, M.D., 2003
Title: Professor of Dual Diagnosis, Mental Illness/Intellectual Disability
Direct Costs: $30,000 (renewed 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017)

Montgomery County Board of Developmental Disabilities Services
Principal Investigator: Julie P. Gentile, M.D., 2003
Title: Professor of Dual Diagnosis in Mental Illness/Intellectual Disability
Direct Costs: $30,000 (renewed 2004, 2005)

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022

Montgomery County Alcohol, Drug and Mental Health Services Board
Principal Investigator: Julie P. Gentile, M.D., 2003
Title: Professor of Dual Diagnosis in Mental Illness/Intellectual Disability
Direct Costs: $30,000 (renewed 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021)

# PRINTED SCHOLARSHIP

**Peer Reviewed Articles**

Harper K, Gentile JP, Bhatt NV. Medical Student-Patients: Mental Wellness During the Pandemic. 2023:20 (4-6). In Press.

Harper K, Gentile JP, Bhatt N, Cannella J. Psychotropics Used to Treat Substance Use Disorders in Adolescents. Accepted for publication. In Press.

Gentile JP, Bhatt N, Cannella J, Harper K, Johnson J. Personality Disorders in Patient with Intellectual Disability. Accepted for publication. In Press.

Gentile JP, Bhatt NV, Harper K, Johnson JA. Adult ADHD: A Brief Review. J Qual Healthcare Eco 2022, 5(3): 000273. ISSN: 2642-6250

Harper K, Gentile JP. Psychotherapy for Violent Behavior in Children and Adolescents. Innovations in Clinical Neuroscience 2022. 19 (7–9).

Harper K, Gentile JP. Psychotherapy for Adult ADHD (Attention Deficit Hyperactivity Disorder). Innovations in Clinical Neuroscience 2022:19 (10-12).

Gentile JP, Bhatt NV, Johnson JA. Reactive Lymphadenopathy: Triggering False Positives on Magnetic Resonance Imaging. J Qual Healthcare Eco. 2022:5(3):000270

Nita Bhatt, Jesse Cannella, Julie P Gentile. Brief Review: Psychological Health and Life Quality of Cerebral Palsy. Am J Biomed Sci & Res. 2022 - 16(1). AJBSR.MS.ID.002194. DOI: 10.34297/AJBSR.2022.16.002

Bhatt Nita V., Guina JP, Gentile JP. Neurologic Conditions in Individuals with Intellectual Disability. J Men Health Psy Dis (2021) Vol 2(103):1-6.

Maharaj, Anjuli S. DO; Bhatt, Nita V. MD, MPH; Gentile, Julie P. MD; Bringing It In The Room: Addressing The Impact Of Racism On The Therapeutic Alliance, Innovations Clinical Neuroscience, 2021.

Amin M, Gentile JP, Edwards B, Davis M. Evaluation of Health Care Disparities for Individuals with Intellectual and Developmental Disabilities in Ohio. Community Mental Health Journal. Springer Publishing, 2021 57(3), 482-489. https://doi.org/10.1007/s10597-020-00669-6

Amin M, Gentile JP, Edwards B, Davis M. Evaluation of Health Care Disparities for Individuals with Intellectual and Developmental Disabilities in Ohio. Community Mental Health Journal. Springer Publishing, 2020. https://doi.org/10.1007/s10597-020-00669-6

Mast R, Harper B, Pollack K, Gentile JP. Pharmacologic Treatment of Attention Deficit Disorder in Children and Adolescents: Executive Function Agents, Stimulants and Sympathomimetics. Journal of Clinical Medicine and Therapeutics. Vol 4, No 1: 2019.

Curriculum Vitae
Julie P. Gentile MD                                          June 2022

Mast R and Gentile JP. Sports Psychiatry: The Mental Health Needs of the College Athlete. Journal of Orthopedics and Sports Medicine. 1 (2019): 037-045.

Merrill BM, Cowan AE, and Gentile JP. House Calls: Telepsychiatry In Patients with Intellectual Disability. Ann Med Health Sci Res. 2017; 7: 463-465.

Dixon D and Gentile JP. Prescribing Psychotropic Medications in Patients with Intellectual Disability: Review and Clinical Pearls. Journal of Childhood and Developmental Disorders. Vol 3 No 4:23. December 2017. DOI: 10.4172/2472-1786.100061

Gentile JP. Interview with the Experts. Intellectual Disability Psychiatry. The Carlat Review (Invited). Sept, 2017.

Gentile JP and Dixon D. Pharmacology in Intellectual Disability. The Carlat Review (Invited). Sept, 2017.

Gentile JP, Cowan AE, Mast R, Harper B, Merrill BM. Reaching Rural Ohio with Intellectual Disability Telepsychiatry. Journal of Telemedicine and Telecare, 0(0) 1–6. sagepub.co.uk/journals. DOI: 10.1177/1357633X17706035. April 2017.

Gentile JP and Gillig PM. Intellectual Disability: Risk For. SAGE Encyclopedia of Abnormal and Clinical Psychology. SAGE Publications, Inc. Los Angeles, CA. 2016.

Gentile JP and Cowan AE. Intellectual Disability: Biological Factors. SAGE Encyclopedia of Abnormal and Clinical Psychology. SAGE Publications, Inc. Los Angeles, CA. 2016.

Weiffenbach JR and Gentile JP. Serotonin Norepinephrine Reuptake Inhibitors. SAGE Encyclopedia of Abnormal and Clinical Psychology. SAGE Publications, Inc. Los Angeles, CA. 2016.

Freeland T and Gentile JP. Delusions. SAGE Encyclopedia of Abnormal and Clinical Psychology. SAGE Publications, Inc. Los Angeles, CA. 2016.

Gentile JP, Gillig PM, Stinson K, Jensen J. Toward Impacting Medical and Psychiatric Comorbidities in Persons with Intellectual/Developmental Disabilities: An Initial Prospective Analysis. Innov Clin Neurosci. 2014;11(11–12):22-26.

Gentile JP. Book Review: Robert J. Fletcher (Ed.) Psychotherapy for Individuals with Intellectual Disability. Kingston, NY: NADD Press, ISBN# 978-1572561281. Journal of Mental Health Research in Intellectual Disability, 00; 1-2, November 2014.

Gentile JP, Cowan AE and Smith AB. (2014) Physical Health of Patients with Intellectual Disability. Advances in Life Sciences and Health/Scientific Publishing. Retrieved from http://www.scipublish.com/journals/ALSH 3403-983.

Gentile JP, Snyder M and Gillig PM. Stress and Trauma: Psychopharmacology and Psychotherapy for Patients with Dissociative/Depersonalization Disorder. Innovations in Clinical Neuroscience. 2014;11(7-8):37-41.

Gentile JP, Dillon KS and Gillig PM. Psychopharmacology and Psychotherapy for Patients with Dissociative Identity Disorder. Innovations in Clinical Neuroscience. 2013;10(2):22-29.

Anklesaria A and Gentile JP. Psychotherapy With Women Who Have Worked in the 'Sex Industry.' Innovations in Clinical Neuroscience. 2012;9(10):16-23.

Manetta CT, Gentile JP and Gillig PM. Examining the Therapeutic Relationship and Confronting Resistances in Psychodynamic Psychotherapy: A Certified Public Accountant Case. Innovations in Clinical Neuroscience. 2011;8(5).

Curriculum Vitae
Julie P. Gentile MD                                                                 June 2022

Foley GN and Gentile JP. Nonverbal Communication in Psychotherapy. Psychiatry (Edgemont) 2010;7(6):38–44

Jensen JA, Gentile JP and Wyatt R. Nighttime Anxieties. Current Psychiatry: Cases That Test Your Skills. Vol. 9, No. 5. May 2010.

Johnson A, Gentile JP, Correll TL. Accurately Diagnosing and Treating Borderline Personality Disorder: A Psychotherapeutic Case. Psychiatry (Edgemont) 2010;7(4):21-30.

Gentile JP and Roman B. Medical Student Mental Health Services: *Psychiatrists Treating Medical Students.* Psychiatry (Edgemont) 2009 May;6(5):38-45

McAweeney M, Rogers N, Huddleson C, Moore D, Gentile JP. Symptom Prevalence of ADHD in a Community Residential Substance Abuse Treatment Program. 2009. (http://jad.sagepub.com/)

Gentile JP, Jackson C. Supportive Psychotherapy for the Patient with Dual Diagnosis: Mental Illness/Intellectual Disabilities, Psychiatry (Edgemont) 2008;5(3):49-57

Gentile JP. Mandated Psychotherapy with the Impaired Physician. Psychiatry (Edgemont) 2008;5(2):42-50

Gentile JP, Niemann P. Supportive Psychotherapy in a Patient with Schizophreniform Disorder. Psychiatry (Edgemont) 2006;3(1):56-61

Gentile JP, Atiq ,R, Gillig PM. Psychotherapy for the Patient with Adult ADHD. Psychiatry (Edgemont), 2006;3(8):31-35

Gentile JP, Atiq R, Gillig PM. Adult ADHD: Diagnosis, Differential Diagnosis, and Medication Management. Psychiatry (Edgemont). 2006;3(8):24-30

Gillig PM, Gentile JP, Atiq R. Attention Deficit/Hyperactivity Disorder in Adults, Hospital Physician, Psychiatry Board Review Manual, 2005;9(2):61-72

Gentile JP, Hubner M. Bereavement in Patients with Dual Diagnosis Mental Illness and Mental Retardation/Developmental Disabilities, Psychiatry (Edgemont). 2005;2(10):56-61

Gentile JP, Gillig PM. Supportive Psychotherapy in a Patient with Mental Retardation. Psychiatry (Edgemont). 2004;1(2):49-54

Gentile JP, Morrison A. Panic Disorder in a Male Patient Following a Car Accident: Supportive Psychotherapy. Psychiatry (Edgemont). 2004;1(3):36-41

Gentile JP. Pathological Grief, Hospital Physician, Psychiatry Board Review Manual, February 2004:2-11

Gillig PM, Gentile JP, Atiq R. Attention Deficit Hyperactivity Disorder in Adults. Journal of Clinical Outcomes Management, January 2004;11(1):51-60

Sansone RA, Gentile JP, Markert RJ. Drug Allergies Among Patients With Borderline Personality Symptomatology. General Hospital Psychiatry 2000. Jul-Aug;(4):289-290

**Chapters in Books**

Mast R, Harper B, Pollack K, Gentile JP. "Pharmacologic Treatment of Attention Deficit Disorder in Children and Adolescents: Executive Function Agents, Stimulants, and Sympathomimetic Amines" in Journal of Clinical Medicine and Therapeutics 2019 Vol.4 No.1:18.

Curriculum Vitae
Julie P. Gentile MD                                           June 2022

Bien E and Gentile JP. Traumatic Brain Injury. Quick Reference Guide to Intellectual Disabilities.
Springer Publishing Company, New York, New York, 2019.

Gentile JP and Bien E. Medical Assessment. Quick Reference Guide to Intellectual Disabilities.
Springer Publishing Company, New York, New York, 2019.

Gentile JP and Cowan AC. Psychotherapy. Quick Reference Guide to Intellectual Disabilities.
Springer Publishing Company, New York, New York, 2019.

Gentile JP. Introduction to Intellectual Disability Psychiatry. Quick Reference Guide to Intellectual
Disabilities. Springer Publishing Company, New York, New York, 2019.

De Koning N, Moreland F, Gentile JP, Troost, P. Feeding and Eating Disorders. Diagnostic Manual
– Intellectual Disability, Second Edition. (2016)

De Koning N, Moreland F, Gentile JP, Troost, P. Feeding and Eating Disorders. Diagnostic Manual
– Intellectual Disability - A Clinical Guide. Second Edition. (2016).

Gentile JP, Benson B, Gillig PM, Fleisher M, Cowan AC. Obsessive Compulsive and Related
Disorders. Diagnostic Manual – Intellectual Disability, Second Edition. (2016)

Gentile JP, Benson B, Gillig PM, Fleisher M, Cowan AC. Obsessive Compulsive and Related
Disorders. Diagnostic Manual – Intellectual Disability - A Clinical Guide. Second Edition. (2016).

Gentile JP, Manetta CT and Jackson CS. Mental Illness and Intellectual Disability. Book chapter
from Textbook of Modern Community Mental Health Work. Oxford University Press (2013).

Cowan AE and Gentile JP. Overview: Psychiatry of Intellectual Disability. In Psychiatry of
Intellectual Disability. Eds. Gentile JP and Gillig PM. Wiley and Sons (2012).

Gentile JP and Monro MA. Medical Assessment. In Psychiatry of Intellectual Disability. Eds.
Gentile JP and Gillig PM. Wiley and Sons (2012).

Gentile JP and Gillig PM. Interviewing Individuals with Intellectual Disability. In Psychiatry of
Intellectual Disability. Eds. Gentile JP and Gillig PM. Wiley and Sons (2012).

Gentile JP and Cowan AE. Personality Disorders. In Psychiatry of Intellectual Disability. Eds.
Gentile JP and Gillig PM. Wiley and Sons (2012).

Gentile JP and Gillig PM. Aggression. In Psychiatry of Intellectual Disability. Eds. Gentile JP and
Gillig PM. Wiley and Sons (2012).

Manetta CT and Gentile JP. Psychotropic Medications. In Psychiatry of Intellectual Disability. Eds.
Gentile JP and Gillig PM. Wiley and Sons (2012).

Jackson CS and Gentile JP. Psychotherapy. In Psychiatry of Intellectual Disability. Eds. Gentile JP
and Gillig PM. Wiley and Sons (2012).

Gentile JP and Roman B. Trauma and Severe Anxiety. In More Than Medication: Incorporating Psychotherapy Into
Community Psychiatry Appointments. Eds. Gillig PM and Morrison A. (2009)

Roman B, Gentile JP and Morrison A. Psychotherapy with Psychotic Patients. In More Than Medication:
Incorporating Psychotherapy Into Community Psychiatry Appointments. Eds. Gillig and Morrison (2009)

Curriculum Vitae
Julie P. Gentile MD                                                          June 2022

Weston C and Gentile JP. Psychotherapy with Children, Families, and Patients with Intellectual / Developmental Disabilities. In More Than Medication: Incorporating Psychotherapy Into Community Psychiatry Appointments. Eds. Gillig PM and Morrison A. (2009)

Coleman F, Gentile JP, Morrison A. Homeless Veterans, In Clinical Guide to the Treatment of The Mentally Ill Homeless Person. Gillig PM, McQuistion HL, Editors, American Association of Community Psychiatrists. 2006: 141-150

**Books**

Gentile JP, Cowan AC and Dixon DW. *Quick Reference Guide to Intellectual Disabilities.* Springer Publishing Company, New York, New York, 2019.

Gentile JP and Gillig PM (2012). *Psychiatry of Intellectual Disability*: UK: Wiley and Sons.

# PRESENTATIONS (Abbreviated list)

- *National Keynote: Global Lessons from a Global Pandemic 2021. National Meeting for National Association of the Dually Diagnosed. (Virtual due to Pandemic).*

- *National Presentation: Forgotten No More: Intellectual Disability Psychiatry Updates 2021.* American Psychiatric Association National Conference 2021 (Virtual due to pandemic.)

- *National Presentation: Outrunning The Bullet: What Psychiatrists Should Know About Mass Shootings.* American Psychiatric Association National Conference 2021. (Virtual due to pandemic.)

- *National Presentation: Transgender Affirming Care: What Every Psychiatrist Should Know.* American Psychiatric Association National Conference 2021 (Virtual due to pandemic.)

- *National Presentation: Dual Diagnosis: Co-occurring Conditions. Washington DC State Board of DDS Annual Conference.* Virtual due to pandemic.

- *National Presentation: Forgotten No More: Intellectual Disability Psychiatry Updates 2020.* American Psychiatric Association National Conference 2020. Philadelphia PA. (Invited; cancelled due to pandemic)

- *National Presentation: Outrunning The Bullet: What Psychiatrists Should Know About Mass Shootings.* American Psychiatric Association National Conference 2020. Philadelphia PA. (Invited; cancelled due to pandemic)

- *National Presentation: Transgender Affirming Care: What Every Psychiatrist Should Know.* American Psychiatric Association National Conference 2020. Philadelphia, PA. (Invited; cancelled due to pandemic)

- *National Presentation: Forgotten No More: Intellectual Disability Psychiatry Updates 2019.* American Psychiatric Association National Conference 2019. San Francisco, CA.

- *National Presentation: What Cannot Be Stated With Words: Nonverbal Patients with IDD and Traumatic Brain Injuries.* American Psychiatric Association National Conference 2019. San Francisco, CA.

- *Indiana University Grand Rounds: Four Keys to Success for Transition Age Autism.* Indiana University, Indianapolis IN, January 2019. (Invited)

- *National Presentation: Forgotten No More: Intellectual Disability Psychiatry.* American Psychiatric Association National Conference, New York City, NY, May 2018.

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022

- ***National Presentation: Games of Thrones and Jessica Jones: Clinical Application of Rape Culture.***
  American Psychiatric Association National Conference, New York City, NY, May 2018.

- ***National Presentation: Challenging Behaviors: Assessment, Pharmacology and Trauma Informed Care in Intellectual Disability.*** Boggs Institute on Developmental Disabilities. Rutgers University, New Jersey, May 2018. (Invited)

- ***National Presentation: Four Keys To Success for Transition Age Autism.*** Michigan State University, Grand Rapids, MI. November 2017. (Invited)

- ***National Presentation: Trauma Informed Practices and Psychopharmacology in ID Psychiatry.*** New Jersey State Department of Developmental Disabilities, October 2017, New Jersey. (Invited)

- ***National Presentation: Trauma Informed Practices in ID Psychiatry.*** Indiana State Department of Developmental Disabilities, October 2017, Indianapolis, IN. (Invited)

- ***National Presentation: Break on Through to the Other Side: ID Psychiatry Residency Training Curriculum and Ohio's Telepsychiatry Project and Coordinating Center of Excellence.*** American Psychiatric Association, May 2017. San Diego, CA.

- ***National Presentation: The Four Keys to Success for Successful Transition Age Autism.*** Michigan Psychiatric Association, April 2017 Ann Arbor, MI (Invited)

- ***Plenary Session: National Association for State Directors of Developmental Disabilities Systems:*** Trauma Informed Care and the Use of Technology for Intellectual Disabilities, Baltimore MD. August 2016. (Invited)

- ***National Teleconference Presentation: Ohio's Telepsychiatry Project for ID: Practicing Medicine in the Digital World.*** October, 2015. (Invited)

- ***National Videoconference Presentation: Trauma Informed Care in the Intellectual Disability Population.*** National Association of State Directors of Developmental Disability Services. Broadcast to 135 sites in the US. September 2014. (Invited)

- ***National Presentation: Team Ohio: Resources for ID/D.*** National Association of State Directors of Developmental Disability Services. New Orleans, LA in June 2014. (Invited)

- ***Keynote Presentation: Trauma Informed Care in the Intellectual Disability Population.*** National Association of State Directors of Developmental Disability Services. New Orleans, LA in June 2014. (Invited)

- *Anxiety Disorders in Intellectual Disability Across the Lifespan.* National Association for the Dually Diagnosed Annual Conference in Baltimore, MD in October 2013

- *Obesity in Intellectual/Developmental Disability Symposium.* National Association for the Dually Diagnosed Annual Conference, Denver, CO in October, 2012. (Invited)

- ***Keynote Presentation: Breakfast with the Experts:*** *Psychotropic Medications and Organ System Review for Patients with ID:* National Association for the Dually Diagnosed Annual Conference, Nashville, TN in November, 2011 (Invited Expert)

- Grief and Loss in ID: Psychotherapy and Pharmacotherapy. National Association for the Dually Diagnosed Annual Conference, Nashville, TN in November, 2011.

- *Psychiatric Treatment for Patients with Co-occurring Mental Illness and Developmental Disabilities,* October, 2010 at the American Psychiatric Institute, Boston, MA (Invited)

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022

- *Keynote Presentation: The Ohio Coordinating Center of Excellence in Mental Illness/Developmental Disabilities and Psychiatric Treatment of the Patient with Dual Diagnosis:* New York City, NY in December, 2008

- *National Association for the Dually Diagnosed National Teleconference Series:* Chief Complaint: Aggression in the Dual Diagnosis Patient in August, 2008 (Invited)

- *Drug Costs and Best Practices in Psychopharmacology in IDD: The Ohio Experience:* National Association for the Dually Diagnosed 24th Annual Conference, Atlanta, Georgia in October, 2007

- *Keynote Presentation: Breakfast with the Experts: Psychiatric Treatment/Psychotropic Medications/Best Practices for Patients with Cognitive Deficits:* National Association for the Dually Diagnosed 24th Annual Conference, Atlanta, Georgia in October, 2007 (Invited Expert)

- *Keynote Presentation: The Role of the Psychiatrist on the Multidisciplinary Team:* National Association for the Dually Diagnosed at Penn State, State College, PN in May, 2007

- *Fragile X Syndrome and Williams Syndrome:* National Association for the Dually Diagnosed at Penn State, State College, PN in May, 2007 (Invited)

- *Psychotropic Medications in the Patient with Dual Diagnosis:* Teleconference presentation to 23 locations in USA and Canada for National Association for the Dually Diagnosed in April, 2006

**Statewide**

- Keynote: Four Keys to Success in Dual Diagnosis. National Association for the Dually Diagnosed. July 12, 2021. (Invited)

- **Keynote:** New Frontiers in Autism Spectrum Disorder. National Association of the Dually Diagnosed. July 12-14, 2021. (Invited)

- **Keynote:** New Pharmacologic Treatments in IDD Psychiatry. National Association for the Dually Diagnosed. Columbus OH, September 2016 (Invited)

- County Collaborative Teams and Intellectual Disability Psychiatry; Bowling Green, Ohio; November 2016

- Pharmacology/Assessment/Behavioral Supports for IDD; DDIT Teams; Columbus OH; October 2016

- **National Association for the Dually Diagnosed** Ohio Statewide Conference: Obsessive Compulsive and Related Disorders in the Intellectual Disability Population: The DM-ID Book Chapter. Columbus Ohio. September 2016.

- **Academy of Direct Care Professionals:** Trauma Informed Care in the IDD Patient Population. Cincinnati Ohio. August 2016.

- Trauma Informed Care and Intellectual Disability Psychiatry; Northwest Ohio Regional Conference; May 2016

- IDD ACE Trauma Study Preliminary Results; Columbus OH; May 2016
- Trauma Informed Care for IDD; Statewide Webinar for the Ohio Department of Developmental Disabilities; May 2016

- Trauma Informed Care for IDD; Statewide Webinar for the Ohio Department of Developmental Disabilities; April 2016

Curriculum Vitae
Julie P. Gentile MD                                                                    June 2022

- Trauma Informed Care and Intellectual Disability Psychiatry for Inpatient Unit; Athens Regional Psychiatric Hospital; April 2016

- Trauma Informed Care and Intellectual Disability Psychiatry for Children; Ohio Dept. of Health Regional Conference, Columbus, OH; March 2016

- Trauma Informed Care and Intellectual Disability Psychiatry for Children; Ohio Dept. of Health Regional Conference; Beavercreek, OH; March 2016

- **Ohio Department of Health**: *Trauma Informed Care in Persons with Intellectual Disability.* Reynoldsburg, Ohio. March 2016 (Invited)

- **Ohio Department of Health**: *Trauma Informed Care in Persons with Intellectual Disability.* Beavercreek, Ohio. March 2016 (Invited)

- Trauma Informed Care; Lucas/Wood Counties Regional Conference; October 2015

- Southwest Ohio Trauma Informed Care Regional Conference; October 2015

- Montgomery County Board of DDS SSA Training: Trauma Informed Care; October 2015

- Trauma Advisory Committee: Overview of MI/ID and Trauma in IDD; November 2014

- Athens County Regional Trauma Conference; November 2014

- Delaware County: Trauma Informed Treatment for IDD; Delaware County Regional Conference, November 2014

- **Keynote Presentation:** *Medical Conditions in Intellectual Disability: Cracking the Code.* National Association for the Dually Diagnosed Ohio Annual Conference; Columbus Ohio, September, 2013

- Ohio's Telepsychiatry Project for Intellectual Disability. **Ohio Provider Resource Association.** Columbus Ohio in October 2013

- **Keynote Presentation:** Healing and Hope: A Trauma Treatment Framework. August 2013.

- Ohio's Telepsychiatry Project in Intellectual Disability. **All Ohio Institute** in Cleveland Ohio in March 2013 (Invited)

- Ohio's Telepsychiatry Project for Intellectual Disability. Statewide Adult Protective Services Inc. Conference in Cleveland in September 2012 (Invited)

- *Obesity in Intellectual/Developmental Disability Symposium.* National Association for the Dually Diagnosed Annual Statewide Conference. Columbus, Ohio in September, 2012

- Psychiatry of Behavior by videoconference delivered to all Ohio Dept. of Mental Health and Dept. of Developmental Disabilities locations in Ohio on October 22, 2010 (Invited)

- **Keynote Presentation:** Intellectual/Developmental Disability: Psychiatric Treatment. Statewide Training in Columbus OH to the DODD Nurses Association on November 1, 2010

- Psychiatry of Intellectual Disability at the Ohio Association of County Board conference in Columbus on December 3, 2010 (Invited)

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022

- *Positive Culture Initiative* at Ohio Provider Resources Association Statewide Conference in March 2010 (Invited)

- *Psychiatric Treatment for Dual Diagnosis Patients: Polypharmacy Issues* at Ohio County Board Association in Columbus, Ohio in December, 2009 (Invited)

- *Interviewing Techniques and Psychiatric Treatment of Patients with Dual Diagnosis* at Positive Initiative Culture in Columbus, Ohio in November, 2009 (Invited)

- *Psychiatric Treatment and Psychotropic Medications* at the PAR statewide conference in October, 2009 in Columbus, Ohio (Invited)

- *Interviewing Patients with Intellectual Disabilities* at the Ohio NADD Conference in September 2009 in Columbus, Ohio

- ***Keynote Presentation: Chief Complaint: Aggression:*** National Association for the Dually Diagnosed 6th Annual Ohio Statewide Conference, Columbus, Ohio in September, 2008

- *Complicated Cases: Dual Diagnosis Patients:* National Association for the Dually Diagnosed 6th Annual Ohio Statewide Conference, Columbus, Ohio in September, 2008

- *The Mental Illness/Developmental Disabilities Coordinating Center Of Excellence:* National Association for Mental Illness Annual Conference in Columbus, Ohio in June, 2007

- *Updates on Dual Diagnosis Intervention Teams, Consultation and Assessment, and Educational Programs of the CCOE in MI/DD:* National Association for Mental Illness Annual Conference in Columbus, Ohio in June, 2007

- *Psychiatric Treatment of the Dual Diagnosis Patient, Syndromes of Mental Retardation, and Behavioral Support Plans:* Summit Behavioral Healthcare Videoconference Series for Behavioral Healthcare Organizations, Cincinnati, Ohio, transmitted statewide, in April, 2007 (Invited)

- *The Ohio Medicaid Psychotropic Database: Prescribing Practices for the Patient with Dual Diagnosis in Ohio:* National Association for the Dually Diagnosed Annual Ohio Conference, Columbus, Ohio in November, 2006

- *Psychotropic Medications in the Dual Diagnosis Patient:* PAR-OHIO Annual Statewide Conference, Columbus, OH in October, 2006 (Invited)

- *Dangerous Side Effects of Psychotropic Medications:* Educational Training for Advocacy and Protective Services, Inc., Columbus, Ohio in September, 2006

- *Syndromes of Mental Retardation, Common Medical Conditions, and Psychotropic Medications in the Dual Diagnosis Patient:* Statewide Conference, Hudson, Ohio in May, 2006

- *Psychiatric Assessment and Treatment of the Patient with MI/DD:* Annual Ohio Psychiatric Association Statewide Conference in Columbus, Ohio in April, 2006 (Invited)

- *Syndromes of Mental Retardation:* Statewide Conference, in Mansfield, Ohio in April, 2006 (Invited)

- *Psychiatric Treatment Issues in the Patient with Multiple Disabilities:* Statewide Conference, Mansfield, Ohio in April, 2006 (Invited)

- ***Keynote Presentation: Fragile X Syndrome:*** National Association for the Dually Diagnosed Annual Ohio Conference, Columbus, Ohio in December, 2005

Curriculum Vitae
Julie P. Gentile MD                                                    June 2022

- *Medications in Dual Diagnosis Patients*: National Association for the Dually Diagnosed Annual Ohio Conference, Columbus, Ohio in December, 2005

- *Keynote Presentation*: *Psychiatric Treatment of the Patient with Developmental Disabilities: Assessment, Behavior Support and Treatment Issues:* Statewide Educational Training, Cincinnati, Ohio in October, 2005

- *Keynote Presentation*: *Psychiatric Treatment of the Patient with Developmental Disabilities: Assessment, Behavior Support and Treatment Issues:* Statewide Educational Training, Cincinnati, Ohio in October, 2005

- *Grief and Loss Issues in the Patient with Dual Diagnosis:* Ohio Provider Resources Association Annual Statewide Conference, Columbus, Ohio in October, 2005 (Invited)

- *Understanding Your Psychotropic Medications*: Ohio Annual Solidarity Conference in Columbus, Ohio, September, 2005 (Invited)

- *The Ohio Coordinating Center of Excellence, Patients with Developmental Disabilities and Mental Illness*: *Case Studies:* Ohio Department of Mental Retardation and Developmental Disabilities All Staff Training, Columbus, Ohio in September, 2005

- *Syndromes of Mental Retardation:* Statewide Dual Diagnosis Conference in Athens, Ohio in April, 2005

- *Psychotropic Medications and Prescribing Practices for the Dual Diagnosis Patient:* Statewide Dual Diagnosis Conference in Athens, Ohio in April, 2005

- *Medications and Treatment Issues For the Patient with Co-Occurring Mental Illness and Developmental Disabilities:* National Association for the Dually Diagnosed Annual Conference, Columbus, OH in December, 2004

- *Keynote Presentation: Introducing the Ohio Coordinating Center of Excellence in Mental Illness/Developmental Disabilities:* National Association for the Dually Diagnosed Annual Ohio Conference, Columbus, Ohio in December, 2004

- *Syndromes of Mental Retardation:* Statewide Conference, in Dayton, Ohio in November, 2004

- *Psychiatric Treatment Issues in the Patient with Multiple Disabilities:* Statewide Conference, in Dayton, Ohio in November, 2004

- *Psychotropic Medications for the Dual Diagnosis Population*: Ohio Department of Mental Retardation and Developmental Disabilities Educational Videoconference, Columbus, Ohio (transmitted to nine additional locations across the state) in June, 2004

**Local/Regional**

- Dayton Psychiatric Society, Wright State University, December 2017

- Medical School Research in IDD Psychiatry, Wright State University; December 2016

- Dayton Police Academy, Critical Incident Training; December 2016

- Violence Against Mental Health Professionals. Consumer Advocacy Model in September 2012.

Curriculum Vitae
Julie P. Gentile MD                                              June 2022

- **Keynote Presentation**: Risk Assessment, Biopsychosocial-Developmental Formulation, Psychotropic Medication, Psychotherapy and Interpreting Behavior in Warren/Clinton counties in October 2012.

- Mental Illness in Intellectual Disability: Collaborative Efforts. Greene County Board of Developmental Disability on February 15, 2011.

- *Mental Illness/Intellectual Disability* presented to Montgomery County Board of DDS Staff on August 18, 2011 (Invited)

- *Psychiatry of Intellectual Disability* to CRSI in Champaign/Logan/Madison County staff on April 22, 2011

- Critical Incident Training for Dayton Police Officers on October 19, 2010

- *Psychiatric Treatment of Patients With Dual Diagnosis,* Medical Staff training Knox County in March, 2010 (Invited)

- *Prescribing Appropriate Medication Regimens for Patients With Dual Diagnosis MI/DD* at the statewide OPRA Conference in March 2010

- *Interviewing Techniques and Psychiatric Treatment of Patients with Dual Diagnosis* at Wright State University Grand Rounds in Dayton, Ohio in November, 2009

- ***Keynote Presentation: Psychiatric Treatment, Prescription of Antipsychotic Medication, and Diagnostic Assessment*** to Clark County DD Staff in June, 2009.

- *Prescribing Antidepressants to Individuals with Dual Diagnosis* to Mental Health Staff in Montgomery County in June, 2009.

- ***Keynote Presentation: Psychiatric Treatment for the Dual Diagnosis Patient*** to Clermont County Mental Health and MR/DD staff in May, 2009.

- *The Victim, Witness or Suspect with Developmental Disabilities* to Montgomery County Law Enforcement Officers in May, 2009.

- *Psychiatric Treatment of the Patient with Developmental Disabilities: Assessment, Behavior Support and Treatment Issues:* Van Wert, Paulding, and Mercer Counties Educational Training, Van Wert, Ohio in April, 2008

- *Behavior Support Plans/Psychotropic Medications/Best Practices in Psychiatric Treatment for the Dual Diagnosis Patient (Mental Illness/Developmental Disabilities):* Warren and Clinton Counties Educational Training, Lebanon, Ohio in April, 2008

- *Interviewing the Victim, Witness or Suspect with Developmental Disabilities:* Critical Incident Training at Dayton Police Academy in Dayton, Ohio in February, 2008

- *Prescribing Psychotropic Medications to Dual Diagnosis Patients:* Medical Staff Training for psychiatrists, child/adolescent psychiatrists, and family practice physicians in Warren and Clinton Counties, Lebanon, Ohio in December, 2007

- *Treatment for the Patient with Traumatic Brain Injury and Co-occurring Mental Illness:* Consumer Advocacy Staff Training, Dayton, Ohio in July, 2007

- *The Suspect, Victim, or Witness with Developmental Disabilities:* Critical Incident Training at Dayton Police Academy in Dayton, Ohio in February, 2007

Curriculum Vitae
Julie P. Gentile MD                                                                June 2022

- *Psychiatric Treatment of the Patient with Dual Diagnosis:* Allen, Auglaize, Hardin, Van Wert, Paulding, Mercer, Wood and Putnam Counties Educational Training in February, 2007

- *Medications and Treatment for the Dual Diagnosis Individual: MI/DD:* Champaign/Logan counties Educational Conference in Dual Diagnosis, Urbana, Ohio in October, 2006

- *The Victim, Witness, or Suspect with Mental Retardation/Developmental Disabilities:* Critical Incident Training at Dayton Police Academy in Dayton, Ohio in May, 2006

- *Psychiatric Treatment and Medication Issues, Syndromes of Mental Retardation, and Commonly Missed Medical Conditions in the Dual Diagnosis Patient:* Muskingum, Coshocton, Guernsey, Noble, Morgan, and Perry Counties Educational Training, Zanesville, Ohio in May, 2006

- ***Keynote Presentation:*** *Psychiatric Treatment of the Patient with Developmental Disabilities: Assessment, Behavior Support and Treatment Issues:* Knox/Licking Counties Educational Training in Mt. Vernon, Ohio in October, 2005

- ***Keynote Presentation:*** *Prescribing Psychotropic Medications, Behavioral Supports, and Syndromes of Mental Retardation.* Allen, Auglaize, and Hardin Counties Educational Conference in April, 2005

- *Physician Training: Treatment of the Dual Diagnosis Patient:* Medical staff training for pediatricians, psychiatrists, child psychiatrists, and family practice physicians in Allen/Auglaize/Hardin counties, April 2005 (Invited)

# EXHIBIT

# PAGE

# DIVIDER



**PLAINTIFF'S EXHIBIT**

3l

12-5-24



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Office of the Dean
3640 Col. Glenn Hwy. • Dayton, OH 45435
medicine.wright.edu

December 5, 2016

Igor Elman, M.D.
7330 Hartcrest Lane
Dayton, OH 45459-4875

Dear Dr. Elman,

I am writing to inform you of my decision to remove you from the position as Chair, Department of Psychiatry, Wright State University Boonshoft School of Medicine and Wright State Physicians, effective December 31, 2016. I am taking this action since you have failed to demonstrate the ability to effectively communicate with faculty and learners, and constructively accept feedback, that is inherent to leading an academic department. I unfortunately have little confidence that you have the ability to remediate these deficits, and I do not feel that I can allow further time for possible remediation to take place. The current situation in the department, where the majority of faculty and learners are trying to actively avoid contact with you, is not one I am prepared to see continue.

Your stipends as Chair from Wright State Physicians and Wright State University Boonshoft School of Medicine will be continued for one calendar year after December 31, 2016, and discontinued thereafter.

You will continue as Professor in the Department of Psychiatry and salary support will remain as described in your initial offer of April 3, 2015. The unused additional support as outlined in the letter dated April 1, 2015, will cease.

You will retain an office in the Department of Psychiatry and continue to engage in teaching, research and patient care as a faculty member. You will retain an office in the department that will be provided after you vacate the chair's office no later than December 31, 2016.

I hope that you will be successful in your research and other endeavors as a faculty member. If there are questions or you need clarification related to this letter, please do not hesitate to contact me.

Cordially,

Margaret M. Dunn, M.D., M.B.A.
Dean

c: Dr. Alan Marco, President/CEO, Wright State Physicians
   Becky Bezich, Executive Assistant to Dr. Alan Marco

DEFENDANT 000155

| | |
|---|---|
| **From:** | Rory Callahan |
| **To:** | Craig Matthews |
| **Cc:** | Wendy Clary; Ashley Barbone; Dori Stone |
| **Subject:** | RE: Molly Hall - rescheduled? |
| **Date:** | Wednesday, December 04, 2024 3:27:54 PM |
| **Attachments:** | Dunn Notes Elman File.pdf |
| | 11-03-16 - Hall Elman Notes.pdf |
| | Elman Painter Notes Aug 4 2016.pdf |
| | Elman Kay Letter Oct 2016.pdf |
| | Elman Gentile Notes Nov 15 2016.pdf |



PENGAD 800-631-6989
**PLAINTIFF'S EXHIBIT**
_32_
_12-5-24_

Hi Craig, These are the documents that the Dean had available to her and reviewed prior to the removal of Dr. Elman as Department Chair. Dr. Gentile was not the decision-maker, but did review her memorandum that she shared with Margaret Dunn.

Rory

Rory Callahan

Principal Assistant Attorney General, Education Section

Office of Ohio Attorney General Dave Yost

30 East Broad Street, 16th Floor

Columbus, Ohio 43215

Mobile: (614) 563-1514

General Office Number: (614)644-7250

rory.callahan@OhioAGO.gov

Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by email or by telephone at 614-644-7250.

**From:** Craig Matthews <cmatthews@ctmlaw.com>
**Sent:** Wednesday, December 4, 2024 11:16 AM
**To:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** RE: Molly Hall - rescheduled?

*Hello Rory,*

*My September 13 correspondence confirmed that you indicated the University would not agree to the stipulation I proposed. If you now believe a stipulation is*

*possible, please send me your proposal.*

*The requested paper documents are critical to meaningful depositions. As I explained, I simply need Drs. Dunn and Gentile to bring to the deposition paper copies of all the documents each reviewed related to Dean Dunn's decision to remove Dr. Elman. If you believe that cannot be done, then we should reschedule until such time as we, or the court, obtain a resolution on that issue.*

*Craig*

---

**From:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Sent:** Wednesday, December 04, 2024 10:53 AM
**To:** Craig Matthews <cmatthews@ctmlaw.com>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** RE: Molly Hall - rescheduled?

Hi Craig, We had not communicated on the stipulation issue since August and September. I recall that we said we had never entered into a stipulation like what you proposed, but invited you to draft something up so we could review and better understand your request. I don't think you ever sent us a draft.

As a practical matter, if we want to move forward with the depositions tomorrow, we should proceed without the subpoena requesting documents from Dr. Gentile and Dr. Dunn. The subpoena is much different than the stipulation you discussed, and is too broad to meaningfully comply with because it is for "all documents related to Dr. Elman". As a practical matter, you have an ample amount of documentation for this case from discovery to depose the witnesses.

Can we agree to go forward with the depositions of Dr. Gentile and Dr. Dunn without the subpoena request for them to bring "all documents related to Dr. Elman?"

Rory

Rory Callahan
Principal Assistant Attorney General, Education Section
Office of Ohio Attorney General Dave Yost
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Mobile: (614) 563-1514
General Office Number: (614)644-7250
rory.callahan@OhioAGO.gov
Confidentiality Notice: This message is intended for use only by the individual or entity to

whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by email or by telephone at 614-644-7250.

---

**From:** Craig Matthews <cmatthews@ctmlaw.com>
**Sent:** Wednesday, December 4, 2024 8:20 AM
**To:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** Re: Molly Hall - rescheduled?

Rory,

We've discussed the document issue at length. You declined to agree to enter into a stipulation as to what documents each witness possesses relating to the grounds for Dean Dunn's decision to remove Dr. Elman as Chair; hence the subpoena. Now you take issue with the subpoena. If you have a proposal which will obviate the need for court involvement, please let me know.

Craig

Sent from small screen while on the move

---

**From:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Sent:** Tuesday, December 3, 2024 6:14:55 PM
**To:** Craig Matthews <cmatthews@ctmlaw.com>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** RE: Molly Hall - rescheduled?

Hi Craig, When we agreed to these dates for depositions for Dr. Gentile and Dr. Dunn, you did not indicate that you were going to issue subpoenas to each witness with records requests for "all documents related to Dr. Igor Elman". There is no identification of specific issues or topics, or even a limitation on documents related to the litigation. We have provided you with all the documents in the University's possession related to this litigation. We provided you the large tranche of documents in March 2023, based on your expansive records requests. I don't think these depositions will proceed well either, if Dr. Dunn, the former Dean for the Medical

School, and Dr. Gentile, the former Vice Department Chair and current Department Chair for Psychiatry at the WSU School of Medicine, would bring hundreds of pages of documents with them that are "related to Dr. Igor Elman". You have previously indicated that you wanted to take 3-4 hours of depositions from each of the four (4) witnesses that you identified, and I don't think proceeding in this manner is conducive to completing those depositions, given this subpoena that you sent last week.

We can schedule a call, but we can also approach the Court as well. Let me know how you want to proceed.

Rory

Rory Callahan
Principal Assistant Attorney General, Education Section
Office of Ohio Attorney General Dave Yost
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Mobile: (614) 563-1514
General Office Number: (614)644-7250
rory.callahan@OhioAGO.gov

Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by email or by telephone at 614-644-7250.

---

**From:** Craig Matthews <cmatthews@ctmlaw.com>
**Sent:** Tuesday, December 3, 2024 4:07 PM
**To:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>; Molly Hall <drmolly@mollyhallmd.com>
**Subject:** RE: Molly Hall - rescheduled?
**Importance:** High

*Hello Rory,*

*Regarding Molly Hall, you have previously indicated she is not a Wright State University employee, and you are not representing her. Thus, I need to hear from* *her that she does not have any documents related to Dr. Elman in her possession*

*despite her accessing her Wright State University and Premier Health email accounts. If she is not able to access her Wright State University account, then I need her to explain why that is. If she is not able to access her Premier Health email account, then I need her to explain why that is. If she is not willing to provide that explanation, then I intend to proceed with the deposition and will ask her in that context. If she can provide the requested documents or a satisfactory explanation for why she cannot access her email accounts, then I will be happy to coordinate a new mutually agreed upon date. **I have copied Dr. Hall in on this email.***

*Regarding the subpoenas to Drs. Dunn and Gentile, the subpoena is clear. They each are to bring to the deposition paper copies of all documents related to Dr. Elman. It is not a question of whether there is "anything new to produce." If your intent is for these employees to vaguely reference documents which purportedly exist in the 176,000 pages provided earlier this year, then I suggest we reach out to the court to discuss. Otherwise, the depositions will be a terrible waste of time. I am available the rest of today and all day tomorrow to discuss with the court.*

*Look forward to hearing from you soon.*

*Craig*

---

**From:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Sent:** Tuesday, December 03, 2024 2:28 PM
**To:** Craig Matthews <cmatthews@ctmlaw.com>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** RE: Molly Hall - rescheduled?

Hi Craig, I spoke with Molly Hall again about this, and let me know if we should talk. My understanding is that she does not have any documents related to Dr. Elman in her possession. My understanding is that she also does not have access to her Wright State University email account at this time, or her Premier Health email account. Is there something specific that you were looking for? I can't tell from the subpoena.

Dr. Hall has said that she has indicated to you that she could appear for her deposition on December 16, 17, 18 or 20. Do any of those dates work for you?

Dr. Hall would like to be released from the subpoena for Thursday, December 5, as she is in with patients that day.

I also see that you've sent us subpoenas for Dr. Dunn and Dr. Gentile with a request for "all

documents related to Dr. Elman." My understanding is that there is not anything new to produce. Is there something specific that you are looking for with that request?

Rory

Rory Callahan
Principal Assistant Attorney General, Education Section
Office of Ohio Attorney General Dave Yost
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Mobile: (614) 563-1514
General Office Number: (614)644-7250
rory.callahan@OhioAGO.gov
Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by email or by telephone at 614-644-7250.

---

**From:** Craig Matthews <cmatthews@ctmlaw.com>
**Sent:** Monday, December 2, 2024 4:45 PM
**To:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** RE: Molly Hall - rescheduled?

*Hi Rory. I told her I would be willing to work with her and you on a new date if she first provides me with the documents specified in the subpoena. She indicated she would search her emails and get back to me. Let's hold the scheduled date and time for now.*

---

**From:** Rory Callahan <Rory.Callahan@OhioAGO.gov>
**Sent:** Monday, December 02, 2024 4:28 PM
**To:** Craig Matthews <cmatthews@ctmlaw.com>
**Cc:** Wendy Clary <Wendy.Clary@OhioAGO.gov>; Ashley Barbone <Ashley.Barbone@OhioAGO.gov>; Dori Stone <dstone@ctmlaw.com>
**Subject:** Molly Hall - rescheduled?

Hi Craig, Molly Hall reached out to us and indicated that she needs to reschedule because she

is in with patients all day on December 5, and traveling on December 6.

Please confirm if we are rescheduling Molly Hall's deposition, and what dates you are looking at for her deposition.

Rory

Rory Callahan
Principal Assistant Attorney General, Education Section
Office of Ohio Attorney General Dave Yost
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Mobile: (614) 563-1514
General Office Number: (614)644-7250
rory.callahan@OhioAGO.gov
Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by email or by telephone at 614-644-7250.